[S. F. No. 13225. In Bank.—August 27, 1929.]

In the Matter of CEDRIC W. PETERSEN, Disbarment Proceedings.

Lillick, Olson & Graham and Joseph J. Geary for Petitioner.

Matt. I. Sullivan, Sullivan & Sullivan and Theo. J. Roche, Leon A. Clark, Joseph J. Webb and Thomas C. Ridgway for Respondents.

F. W. Sawyer, *Amicus Curiae.*

THE COURT.—On February 20, 1928, Amelia J. Rodrick, by her guardian *ad litem,* John Rodrick, filed with The State Bar of California her verified complaint against Cedric W. Petersen, a member of The State Bar, charging him with misconduct involving moral turpitude, constituting a ground for disbarment. Petersen was directly charged with subornation of perjury, and with compounding a felony in bringing about the marriage of the complainant with one Erasmus J. Silveria, who had been held to answer before the superior court upon a charge of statutory rape alleged to have been committed upon Amelia, in which Petersen was Silveria's attorney, one trial having been had in which the jury disagreed. Proceedings were inaugurated by the local administrative committee of Alameda County, to which the complaint was referred for hearing and action, by the issuance of an order to show cause directed to Petersen, and protracted hearings and the taking of much evidence followed. The committee duly filed its findings and conclusions. It found that Petersen was not guilty of compounding a felony, but held that the subornation of perjury charge had been proved in that Petersen had advised Amelia J. Rodrick and her parents to swear that Amelia was of the age of sixteen years, for the purpose of securing a marriage license to marry Silveria, when in truth and in fact he knew she was but fourteen years of age.

Hilding G. Brelin also presented to The State Bar a complaint charging Petersen with misconduct as an attorney at law involving moral turpitude in the alleged unauthorized alteration, collection of, and use by Petersen of the proceeds of a check for $280, signed by Mrs. John F. Borden, made payable to Brelin, and turned over to Petersen by Brelin to do with as he chose, provided it did not interfere with a claim of $720 against Mrs. Borden, for which an action was about to be instituted. By an amendment, Petersen was further charged with making false

affidavits in verifying a complaint and to secure an attachment in the action.

The Rodrick and Brelin matters were, by stipulation, consolidated for hearing, and in the Brelin matter the committee made findings, in practical effect, that Petersen had been guilty of a misappropriation of funds belonging to Brelin.

The recommendation of the local administrative committee to the Board of Governors was that Cedric W. Petersen be disbarred. After a further hearing of oral argument on behalf of Petersen and the filing of certain documentary evidence, the Board of Governors adopted as its findings the findings of the local administrative committee, in both cases, and by formal resolution recommended Petersen's disbarment. Within the prescribed time, Petersen petitioned this court to review the decision of the board.

The petitioner claims that:

1. The State Bar Act is unconstitutional and void;

2. The petitioner is deprived of a valuable property right without due process of law;

3. The facts, as disclosed by the evidence, do not support the resolution of disbarment.

The first of these contentions may be dismissed, it having been decided in *State Bar of California* v. *Superior Court*, 207 Cal. 323 [278 Pac. 432], and in *In re Cate*, 207 Cal. 443 [279 Pac. 131], that the State Bar Act is constitutional.

The second contention, that if the present disbarment proceeding be allowed to remain in force the petitioner will be deprived of liberty and a valuable property right without due process of law, is based upon the assumption that the action of the Board of Governors is a final proceeding. That is not so. By section 26 of the State Bar Act (Stats. 1927, p. 41) the power of disbarment rests finally and solely with this court. (*In re Shattuck, ante,* p. 6 [279 Pac. 998].) Nor does a proceeding under the State Bar Act deprive anyone of property or right without due process of law, since notice and hearing are provided for, and a hearing is given in the court of last resort. (*In re Bruen,* 102 Wash. 472 [172 Pac. 1152].)

As to the third point made by the petitioner, the alleged insufficiency of the evidence to support the resolu-

tion of disbarment, this court will treat the findings of the Board of Governors as special findings of an intermediary agency, in order that our review may extend to the determination of the sufficiency of the facts to support them, and whether or not the findings, in turn, support the recommendation of the board. (*In re Shattuck, supra.*)

Directing our attention first to finding No. V in the Rodrick case, it is as follows: "That at each and all of the times hereinabove referred to, wherein said Cedric W. Petersen, said accused, directed and instructed the complainant, and her said father and mother to swear upon the application for said marriage license that said Amelia J. Rodrick was of the age of sixteen years, as hereinbefore set forth, he did so wilfully, and with the desire and intent to procure a marriage license for said Amelia J. Rodrick and Erasmus J. Silveria, and with the wilful design and intent of procuring said Amelia J. Rodrick to commit perjury."

The salient facts leading up to the Rodrick charge are as follows: Erasmus J. Silveria, a youth of about nineteen, had been charged with statutory rape alleged to have been committed upon Amelia J. Rodrick at the ranch home of her parents near Livermore some time during December, 1926, and January, 1927. The Rodricks (or Rodriguez) and the Silverias were neighboring farmers, living about three miles apart. The two families were of Portuguese descent, the older members talking and understanding the English language but imperfectly. The Silverias were in much more comfortable circumstances than the Rodricks and had a more pretentious home than the Rodricks, who lived in a small ranch-house occupied by several people. Young Silveria had lived with the Rodricks for some time, enticed there, as the Silverias believed, by the Rodricks, and against his parents' desires. The Silverias were old clients of Petersen, and he had, at one time, also rendered professional services for the Rodricks. The Silverias asked Petersen to represent their son on the charge of rape. Upon his advice, Livermore attorneys were engaged to appear at the preliminary hearing in the justice court of that town. Young Silveria was held to answer before the superior court. Petersen conducted the superior court trial, and the jury disagreed. Judge Leon Gray of the Superior Court of Ala-

meda County, who presided at the trial of young Silveria, furnishes something of the atmosphere of the situation. He testified in the present proceeding that "the attitude of the Rodricks all the way through was to do everything in their power to encourage" marriage, and "threw the children together as much as possible"; "that the Silverias thought they were a little better and that it would be a mesalliance, and they did everything in their power to stop it," and finally succeeded in taking the boy home, not by force but really by "coercion" and against his desire. "It was very clear from the attitude of the Rodricks," testified Judge Gray, "that the rape case was designed to force the marriage." After Erasmus was taken home by his parents, the charge of statutory rape was made against him by the Rodricks, and it was apparently broadcast about Livermore that Amelia was pregnant. This, however, it appears, was not a fact. The effect of this gossip in the community will be appreciated. In the superior court, the sole testimony as to the age of Amelia was that of the Rodricks. They testified that she was under fourteen years of age at the time of the occurrences. The only testimony as to rape was that of Amelia herself. Petersen's defense was that Amelia was of statutory age, as he claims he believed. He seems to have consistently believed, at all the times here involved, that the Rodricks were lying as to Amelia's age; and claims that the physical appearance and sophistication of Amelia strongly indicated otherwise. Nothing authentic as to the girl's age appeared until the production of a baptismal certificate during this investigation, which must be accepted as *prima facie* evidence of its recital that she was born in 1913. Until this record was found, Petersen's efforts to establish Amelia's age by search of records had been fruitless, and the question of age seems to have been unsettled all through the proceedings complained of, and there is testimony from which Petersen was entitled to draw inferences that Amelia's parents were adjusting her age for purposes of their own. A material fact, though, is that Petersen seems to have sincerely believed that Amelia was sixteen years of age, and that Rodrick, the father, had told him she was sixteen, raising an inference that the Rodricks had lied about the matter. Within two days after the ter-

mination of the first trial, Deputy District Attorney Chamberlain, in charge of the prosecution of Silveria, was approached by the girl's parents to ascertain his attitude toward a marriage of young people. It was stated to him that the Silverias had come to them, the Rodricks, and were then willing that their boy should marry Amelia. Petersen was not present at this interview and had no knowledge of it until the deputy district attorney testified to it at the hearing in the matter. Mrs. Rodrick denied having had such an interview with Chamberlain.

The prospects of a second trial appear to have been greatly upsetting to the Silverias. It had been developed during the trial that the young people were really in love with each other, irrespective of the bitter feeling of their parents, and Petersen arranged to have the Rodricks call at his office to ascertain if this feeling still· existed, and, if it did, then to suggest marriage as the proper solution, which, provided there was no legal obstacle, seems to be an eminently proper thing to do in such a case. Petersen claims that he was then still under the belief that Amelia was, in reality, sixteen, and not fourteen, as her parents had testified. Counsel for The State Bar, in answer to Petersen's claim in this regard, cite the facts established by the record that at, or about, the time the matter of a dismissal of the charge against Silveria was pending, Petersen endeavored to find out from the office of the county clerk of Alameda County if "there was any way a marriage license could be procured for a person if there was a doubt if she was under sixteen years of age." The real issue here, however, seems to rest upon what Petersen is alleged to have said to the Rodricks in relation to securing a marriage license, having the young people married and the case dismissed. The subornation of perjury charge rests upon the story of the Rodricks and the two corroborating witnesses · concerning the use of the word "sixteen" by Petersen.

The evidence given by Amelia and her parents, and which was sought to be corroborated by two witnesses, Himes and Mrs. Philbrook, was to the effect that, in his private office, again in his outer office or reception room in the presence of Himes, and again on the following Saturday when all the interested parties had come together to secure a marriage

license, Petersen had told the Rodricks "to say that Amelia was sixteen years of age." Petersen denies having used the phrase testified to upon any of the occasions testified to. He is corroborated as to the first meeting by his stenographer, who was placed purposely to overhear the conversation with the Rodricks in his private office, and by Alice Boylan, who occupied desk room in the outer or reception office where the Rodricks and Himes claim the statement was made to "be sure to say sixteen." Each testified she heard no such statement. The Rodricks' corroborating witness, Himes, a fur trapper occupying, rent free, a shack on the Rodrick place, was admittedly under obligations to them, and very friendly. He admitted having talked the matter over on several occasions with the Rodricks, and accompanied them to Petersen's office on the first visit, remaining in the outer office. He attempted to make it plain that he was testifying not from what he had discussed with the Rodricks, but that he had made a note on a piece of paper of what occurred which was in a trunk somewhere and was not produced. His reasons for making the memorandum somewhat tax our credulity, but it is, nevertheless, very significant that, when held down to the facts, he finally testified as follows: "Q. What did Mr. Petersen say about the girl being sixteen? A. He just simply said she had to be sixteen in order for them to get married. Q. Who did he say that to? A. In front of Mr. Rodrick, Mrs. Rodrick and the girl Amelia Rodrick at that time. Q. And yourself? A. Yes, sir."

The other corroborating witness of the Rodricks' story was Mrs. Philbrook, who testified as to what she claimed to have overheard on Saturday morning, and as to what she claims to have said. She testified that she was an ordained minister of The Eternal Truth Church, and therefore familiar with the requirements of the marriage law. She had attended the criminal trial throughout, and had heard the testimony as to Amelia's age, yet she was present to be a witness of the marriage for the Rodricks, knowing it to be unlawful. When questioned as to why she acted as a witness to an illegal marriage, she replied: "It was none of my business." Mr. and Mrs. Silveria and Erasmus, who were admittedly present and a part of the group, testified they did not hear Petersen make any such state-

ment as the Rodricks claim he made. They were not impeached, and the intendments are as strong in their favor as in favor of the others testifying in the matter. It would lengthen too much this consideration to attempt to go into detail and point out what appear to us to be the many weaknesses, inconsistencies and apparent contradictions of the Rodricks' testimony, and that of Himes and Mrs. Philbrook; but a fair reading of it leads to the conclusion that the finding above set out of the local administrative committee, approved by the Board of Governors of The State Bar, is not sufficiently supported by such clear and convincing evidence, free from doubt, as should be required in such a case. Petersen was acting with the knowledge of the trial judge and the deputy district attorney, but without promises of any sort on their part. The license was obtained and Erasmus and Amelia were married. When the motion was made to dismiss the charge against Erasmus, Judge Gray called in the official reporter and conducted an examination of the parties to establish that a voluntary marriage had been entered into, and then dismissed the case.

When the two families reached the street after the dismissal of the case the intense feeling between them flared up because of the insistence of the Rodricks that the young people make their home with them, the Silverias insisting that it be made with them. The discussion became so animated as to create a street scene. It was finally arranged that young Silveria should drive his parents home, as neither could drive the automobile, Amelia and her father accompanying them. When they arrived at the Silveria home, Rodrick refused to allow his daughter to remain there with her husband. Erasmus did remain there. Amelia returned to the Rodrick home. Neither thereafter left their respective homes, and have not lived together since. Mrs. Rodrick made further efforts to have the rape charge renewed. The Silverias provided and furnished a room for the young people and asked Amelia to live there, but she refused. Rodrick testified that he was willing ''to furnish a house, groceries, grub for thirty days or sixty days, or until he ever get a job, get the credit in the store.'' After a time the Silverias went to Petersen for advice, and

he advised them properly that a wife must conform to a reasonable mode of living provided by the husband, and he wrote a letter to that effect to Amelia, which was signed by Erasmus. An answer to it seems to have been prepared .by an attorney named Wilson. Several weeks passed, during which Erasmus received a letter from Amelia saying she would do anything he wished, and to come and get her. Another letter was dictated by Petersen, signed by Erasmus, and sent to Amelia, in which Erasmus reiterated his desire that Amelia come and live with him and that he would be glad to show her what arrangements had been made. Copies of these letters are set forth in the copy of the affidavit of Erasmus Silveria attached to Petersen's answer in these proceedings. No response was ever received to the last letter, and Rodrick engaged an attorney to bring an action against young Silveria for maintenance, with motions for alimony, attorney's fees and costs. This came on for hearing, and Petersen filed an affidavit therein, prepared by himself and sworn to by Silveria, wherein it was stated, Petersen claims by inadvertence, that Amelia was but fourteen years of age, quite contrary to Petersen's contention and what the Rodricks had sworn to in securing a marriage license. The making of this statement is cited here as a damning admission on the part of Petersen that he knew all the time that Amelia was fourteen. When the preliminary motion for alimony, etc., came on, in answer to some questions by the court, it was stated that Amelia was but fourteen years of age, which raised a question as to the status of the marriage, and in consequence no order was made of any kind in the matter. The attorney for the Rodricks then charged Petersen with misconduct in having theretofore advised the Rodricks to swear falsely about the age of Amelia. Petersen's explanation of the reference in the affidavit to Amelia's age is rather weak. He claimed that any reference to her age in the affidavit was an inadvertence, and immaterial in the then proceeding; that a valid marriage had been solemnized, and the material matter he was called on to combat was the refusal of Amelia to live with her husband; and that he was in fact relying upon the statement made by Rodrick in his office that Amelia was sixteen. The action for support came on sub-

sequently to be heard, Petersen, as attorney for Silveria, having filed an answer and cross-complaint for divorce. Neither party prevailed. Thereafter, Amelia swore to the charges against Petersen here being considered.

Upon the record we are confronted with the problem as to which of two constructions to adopt upon a hopeless conflict of testimony concerning what actually did happen and what Petersen actually did say. We must either conclude that Petersen deliberately advised the Rodricks to commit perjury under conditions of publicity and liability to official investigation in connection with the dismissal of a criminal charge, or that the Rodricks have unintentionally or intentionally distorted into a semblance of truth Petersen's endeavors to make them understand the age requirements of the statute, he being himself convinced, and believing at the time, that Amelia was sixteen years old and that her parents were not telling the exact truth as to her age. As to what occurred, and the exact language used, we cannot be certain. There are conflicts, inconsistencies and contradictions, however, in the testimony as a whole, some due, no doubt, to the antagonistic feelings of the two families, the imperfect understanding and expression of the English language, a strong taint of animus from different angles toward Petersen, and certain testimony that bears all the earmarks of having been rehearsed by the Rodricks and their corroborating witnesses.

In a matter as serious as the disbarment of an attorney at law, with its attendant degradation and probable effects upon a man's livelihood, the accused is, and should be, entitled to every favorable intendment and inference in his favor, and to the benefit of such proof of good character and reputation as he is able to make. The great weight of authority is to this effect. There was no direct attack on the truth and honesty of any witness. The evidence of Petersen and the Silverias is entitled to as full weight as that of the other witnesses, and the conflict between it and that of the accusers must be resolved, we feel, by consideration of all the circumstances of the case, the animus and desires of the complaining parties, and the impetus given to the prosecution by the advice of an attorney whose actions indicate that he felt that someone had grievously erred in

bringing about the marriage of Amelia and Erasmus under the facts as related by the Rodricks. ▇ On the whole record of this part of the proceeding to disbar the petitioner, we can accept it as tending only to raise little more than a suspicion that Petersen may have been decidedly indiscreet in his method of procuring the dismissal of the criminal charge against his client. The evidence does not have the persuasive force the local committee appears to have accorded it.

Coming now to the charge against Petersen made by Brelin, it appears from the record that Brelin, as architect, had rendered services to Mrs. John F. Borden. A controversy arose between them as to the amount finally due Brelin. Mrs. Borden sent Brelin a check for the sum of $280, marked "Paid in Full." Brelin, claiming that Mrs. Borden owed him $720, and "being afraid of doing anything with the check," took it to Petersen, and placed it in the latter's keeping with instructions "not to do anything with the check to hurt the case." At the same time, he directed Petersen to file suit against Mrs. Borden "for the entire bill." What Petersen did in the matter is established by the following findings, made by the local administrative committee and adopted by the Board of Governors. In our opinion, they are fully supported by the evidence. They are:

"II.

"That the said Cedric W. Petersen received from one Hilding G. Brelin a check in the sum of $280, dated November 5, 1926, and drawn in favor of the said Hilding G. Brelin, and signed by Mrs. John F. Borden, and drawn on the Central National Bank of Oakland, California; that upon the face of said check appeared in writing the following, to wit: 'In full'; that said Cedric W. Petersen, upon the 20th of November, 1926, drew a line through the words 'in full,' on the face of said check, and endorsed the same as follows: 'On account only, H. G. Brelin by C. W. Petersen, his Attorney, Cedric W. Petersen, Trustee.'

"III.

"That upon the 20th day of November, 1926, said Cedric W. Petersen caused the said check to be certified by said

Central National Bank; that upon the 22nd day of November, 1926, said Cedric W. Petersen deposited said check in an account in the Commercial Trust and Savings Bank (now the First National Bank in Oakland) which account was designated as 'Cedric W. Petersen, Trustee'; that thereafter, and within a period of one month said Cedric W. Petersen withdrew the greater portion of said money and appropriated it to his own use; that at no time from the 15th day of November, 1926, until the 14th day of February, 1927, did the said H. G. Brelin know that said Cedric W. Petersen had caused said check to be certified, or had deposited said check in said bank, or at all, or had used the same, or any part or portion thereof, for his own personal use, or otherwise, and that at no time did said H. G. Brelin, or any one in his behalf, authorize said Cedric W. Petersen to use the said money represented by the said check, or any part or portion thereof, for his own use.

"IV.

"That on the 22nd day of November, 1926, the said Cedric W. Petersen caused the said H. G. Brelin to verify a complaint filed in the Superior Court of the State of California, in and for the County of Alameda, against Clara F. Borden (who is the same person as said Mrs. John F. Borden) and John F. Borden, her husband, and which said complaint set forth the full amount of the claim of said H. G. Brelin against the said Bordens, and which said full amount of said claim was in the amount of $720, and which said complaint set forth that no payment had been made thereon, and that the entire sum was due, owing and unpaid; and upon the said date, the said Cedric W. Petersen also caused the said H. G. Brelin to execute an affidavit for the purpose of securing a Writ of Attachment in said action, in which the averments were in substance the same as the said allegations of the said complaint; that on the 23rd day of November, 1926, the said Cedric W. Petersen wilfully caused said complaint and affidavit to be filed with the Clerk of said Court, and a Writ of Attachment to be issued on said affidavit, knowing that said verified complaint and said affidavit to obtain said Writ of Attachment were false and untrue, in that said check had theretofore been certified and banked as aforesaid;

## "V.

"That at the time said Hilding G. Brelin delivered said check to said Petersen, said Petersen was told by said Hilding G. Brelin that he could do with said check as he saw fit, but to deal with it so as not to injure his case against said Bordens;

## "VI.

"That said Petersen at all times concealed from said Brelin the fact that he had caused said check to be certified; also the fact that he had altered said check; also the fact that he had deposited said check in his account; also the fact that he had used the greater portion of the sum represented by said check, and that none of said facts were disclosed to said Brelin until the trial of said case against the Bordens, when the check was produced during the cross-examination of said Brelin by counsel for defendants;

## "VII.

"Shortly following the trial of said action in the Superior Court, said Brelin made a demand upon said Petersen for an accounting of said sum of $280, but that said Cedric W. Petersen has at all times failed to render any such account; that shortly thereafter said Brelin recovered a judgment in the Justice's Court of Oakland Township against said Petersen for said sum of $280."

Other than these facts so found, the court, in the action, *Brelin* v. *Borden,* decided that Mrs. Borden was indebted to Brelin in the sum of $280, and no more. After Brelin obtained the judgment against Petersen for the amount of the check, the latter paid $50 on account. Before the balance was paid these proceedings in disbarment were brought, and Petersen claims the proceeding was brought as a means of compelling him to pay in full. Since this inquiry was inaugurated he has paid the judgment, including interest and costs. He made a plausible, but not convincing, explanation of his method of carrying his personal and clients' bank accounts, and offered in excuse of his action in depositing the check and appropriating the money the contention that Brelin was indebted to him for legal services. The explanation does not satisfy. The whole transaction, which is reflected in the findings on the charge made by Brelin, was not conducted along any high or even

medium, standard, if there can be a medium standard in legal ethics. We are unable to accept petitioner's contention that, when Brelin placed the Borden check in his hands and told him to do whatever he thought best with it so long as it did not affect Brelin's claim against Mrs. Borden, he, Petersen, was thereby authorized to collect the amount of the check and appropriate the money to his own use. He had no right to so use the money. He was further guilty of misconduct as an attorney at law in causing Brelin to swear to the truth of the allegation in the complaint against Mrs. Borden, and to make the affidavit for attachment in the action, in each of which it was alleged there was due Brelin the sum of $720, when in fact, as Petersen well knew, under any theory of the case, $280 had been paid on the claim for services rendered by Brelin.

Both the local administrative committee and the Board of Governors of The State Bar accorded Petersen every reasonable opportunity to clear himself of the serious charges involving his conduct and standing as a member of the legal profession. ■ By the terms of the State Bar Act (sec. 26), the burden was cast upon him of showing here wherein the decision of the Board of Governors was erroneous or unlawful. He has not satisfactorily lifted that burden. His explanation and defense of his action have not been satisfactory. ■ But we feel, under all the circumstances as detailed above, that a judgment of suspension from the right to practice for a definite period will be adequate punishment for the offense committed by petitioner, instead of the more drastic penalty of disbarment. Prior to the initiation of these charges against the petitioner, he appears to have enjoyed a good reputation as an attorney, having a large clientele, and being entrusted with the handling of important matters for his clients. He has rested under the cloud of these charges, followed by the recommendation of the Bar Governors, for a year and a half, which in and of itself, is a severe ordeal.

It is therefore ordered that the action of the Board of Governors in this matter be approved, in so far as the findings and decision relate to the charges made against petitioner by Hilding G. Brelin, and that Cedric W. Petersen be suspended from the rights and privileges of an at-

torney at law for the period of one year from and after the date of the filing of this order.

Rehearing denied.

All the Justices present concurred.