[S. F. No. 16384. In Bank.—Oct. 20, 1941.]

CLIFTON HILDEBRAND, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Louis E. Goodman and Sheridan Downey for Petitioner.

Edward F. Treadwell, W. Eugene Craven, J. W. O'Neill, Gilford G. Rowland and Claude Minard for Respondent.

THE COURT.—Pursuant to an order issued by The State Bar of California, the petitioner, Clifton Hildebrand, an attorney at law, was directed to appear before Special Local Committee No. 3 for the county of Alameda on or about July 18, 1939, then and there to show cause why he should not be disciplined for alleged professional misconduct on four separate charges as set forth in the said order. The charges consisted of three counts of violation of the provisions of rule 2 (commonly known as the "solicitation" rule) and of violation, on one count, of rule 3 (generally referred to as the "ambulance chasing" rule) of the Rules of Professional Conduct of The State Bar of California. Petitioner filed his answer to the order to show cause in which he denied having violated the rules to which reference has been made. After extended hearings were had before the local administrative committee, findings of violation as charged were made on each of the four counts, and thereupon it was recommended by the said committee that petitioner be suspended from the practice of the law for a period of six months on each count—the suspensions to run concurrently. Following submission of the record to the Board of Bar Governors that body made its own findings, in which it was adjudged that each of the four charges set forth in the order to show cause was sustained by the evidence, together with the recom-

mendation that the same sentence be imposed as that advised by the local administrative committee.

## The Hash-Martin Matter.

In the charge on the first count as set forth in the order to show cause, which will be referred to as the Hash-Martin matter, petitioner was accused of having wilfully solicited (on or about or shortly after October 30, 1937) the professional employment of himself as an attorney at law in connection with an automobile accident which occurred near Livermore, California, on Saturday afternoon, October 30, 1937, as a result of which Vernon Hash and John Martin sustained serious injuries and Mrs. John Martin was fatally injured, her death occurring about three days thereafter. The solicitation was alleged to have been made by petitioner to Mrs. Donna Martell, a sister of Vernon Hash and Mrs. Martin, and a sister-in-law of John Martin.

The injured persons were taken to the Livermore General Hospital, which was a private institution operated by Dr. Lawrence J. Giubbini, who was a licensed chiropractor but who was not a medical practitioner. Dr. W. L. Meyers was called to the hospital to treat their injuries. Shortly thereafter Mrs. Martell of San Francisco was summoned to the hospital. Petitioner had nothing to do with their being taken to the hospital, the calling of Dr. Meyers, or the summoning of Mrs. Martell to the hospital. Both Dr. Giubbini and Dr. Meyers were friends of petitioner herein, and each formerly had been his client. According to the testimony of Mrs. Martell, it appears that soon after she arrived at the hospital she expressed some concern to Dr. Giubbini about the ability of her brother, Mr. Hash, to pay for medical and hospital expenses; that Dr. Giubbini told her in effect that "they" would take care of his (Mr. Hash's) expenses (it does not appear who was meant by "they" nor that Giubbini's statement was authorized by petitioner); that later that morning she was requested by Dr. Giubbini to go to his home, which was adjacent to the hospital, for the purpose of meeting "an attorney and investigator and others over there"; that she appeared at Dr. Giubbini's residence at about 10:30 o'clock that morning where she was introduced by Dr. Giubbini to petitioner herein; that petitioner wanted her to

sign a paper to the effect that she would permit him to
"take care of the accident and settle everything for us";
that he showed her photostatic copies of checks represent-
ing different sums of money which petitioner stated he had
recovered for some of his clients in connection with various
damage suits; that he told her they had investigated the Hash-
Martin accident, that the father of the driver of the other
automobile involved in the accident was wealthy and assured
her that the Hash-Martin suitors could expect to receive a
considerable sum of money as damages for the injuries sus-
tained by them if she would permit him to settle their acci-
dent claim; that she told petitioner she could not sign any
papers on behalf of either her brother or brother-in-law and
that petitioner would have to wait "until they got better,
they would have to attend to that themselves"; that there-
tofore she had not known nor ever heard of petitioner; and
that she had not requested Dr. Giubbini, or anyone else,
to have petitioner come to the Livermore hospital in connec-
tion with the injuries sustained by her relations. The evi-
dence shows that shortly after the conversation had between
petitioner and Mrs. Martell he went to the hospital and was
introduced by Dr. Meyers to Vernon Hash and John Martin,
and that on that occasion each of the injured men signed an
agreement to employ petitioner. The testimony of Vernon
Hash was likewise to the effect that theretofore he had not
asked anyone to call petitioner, or any other attorney, to
come to see him, and that he had not discussed the prospective
employment of an attorney with anyone. Mr. Hash testified
in part as follows:

" . . . he (petitioner) was introduced to me by Dr.
Meyers, and he told me that . . . he could handle my case,
it would do me a lot of good. . . . He showed me checks he
had got for other people, different amounts." John Martin
also testified that petitioner told him he was an attorney and
that he, petitioner, "could handle my case for me"; that prior
to that occasion he had not known nor heard of petitioner;
and that he had not asked anyone to call an attorney on
his behalf. With respect to Mr. Martin there was evidence
to show that because of the seriousness of his injuries, dur-
ing the first few days following his arrival at the hospital,
he was not wholly aware of what took place in his presence,

and that he was assisted in the signing of his name to the employment agreement.

As opposed to the foregoing, convincing evidence was offered on behalf of petitioner. Dr. Giubbini testified that he talked with Vernon Hash about the case during the afternoon of the day that the latter was brought to the hospital; that Mr. Hash asked him to get a lawyer "right now" and whether Dr. Giubbini knew of an attorney in San Francisco; that he, Dr. Giubbini, replied that he did not know any attorneys in San Francisco but that he knew several in Oakland, and that he then recommended petitioner to Mr. Hash. The testimony of Dr. Meyers was to the effect that at some time during the evening following the happening of the accident Mr. Hash told him that Dr. Giubbini had recommended petitioner as an attorney; that Mr. Hash asked him about petitioner's qualifications and that he told Mr. Hash that he knew petitioner and thought him to be well qualified to handle that type of case; that Mr. Hash then asked him to contact petitioner, whereupon he instructed one of the nurses to telephone to petitioner and tell him to come to the hospital (petitioner testified that Dr. Meyers telephoned him that some people at the hospital desired to see him about a case); that Mr. Hash asked him to contact his sister (Mrs. Martell) for the reason that he "would like her to know about what they were going to do to see if satisfactory to her." Petitioner testified that in response to a telephone call which he received from Dr. Meyers the night before advising him that some people at the hospital desired to see him professionally, he came to the hospital on Sunday, the day following the accident; that when he arrived there he went to Dr. Giubbini's home where Dr. Meyers introduced him to Mrs. Martell as the attorney about whom Dr. Meyers and Mr. Hash had spoken; that Dr. Meyers told Mrs. Martell that her brother had said he wished her to talk over the matter (of presenting claim for damages in connection with the accident) with petitioner, and that her brother wished petitioner to "explain the situation" to her. According to his testimony, petitioner then explained certain aspects of the matter to Mrs. Martell and showed her photostatic copies of checks representing various sums of money which he had obtained as the result of litigation he had conducted in other damage suits—for the purpose of enlightening her as to the

nature of the case and in answer to her questions with respect to certain features of a damage case, i. e., as to the length of time required before a recovery or settlement might be expected, the amount that might be anticipated as recovery for the type of injury received, etc. In that regard petitioner testified that he found when clients asked him questions about different cases they remembered more about the matter if it were explained graphically to them, whereupon the following colloquy took place: ''Q. When you showed her the checks, did you say you wanted her to see the accomplishments in your other cases? A. I didn't put it exactly that way. She asked questions about what they could expect to get, what the cases were worth, and I tried to give her some idea by giving some examples of what had been done in other cases.''

From the foregoing it is apparent that the testimony of the several witnesses presented a sharp conflict. However, the evidence is clear that petitioner was informed that there were some people at the hospital who wished to see him professionally. He went to the hospital to see those people in response to that information. While it is true that the testimony of Hash and Dr. Giubbini and Dr. Meyers is conflicting as to whether Hash had requested the doctors to obtain an attorney for him, and even accepting Hash's version as true, it does not appear that petitioner knew the fact, if such were the case, that the people had not requested to see him professionally. There is no convincing showing of any arrangement between either Dr. Meyers or Dr. Giubbini and petitioner by which the former were to obtain clients for the latter, or that Giubbini in any way represented petitioner. Therefore, it is entirely reasonable to conclude that when petitioner went to the hospital he was doing so in entire good faith and upon the justifiable assumption that he was there to meet persons who desired to employ him. There was no solicitation on petitioner's part or any unethical conduct in going to see those persons under such circumstances. If such were solicitation an attorney would never be permitted to speak to a prospective client concerning a prospective professional employment except in those instances only in which the client personally asks for an attorney to represent him in some matter. After arriving at the hospital and being introduced to Mrs. Martell, petitioner discussed the case with

her and proposed that she sign a contract employing him. He exhibited to her copies of checks he had obtained in settlement of other cases. The same occurred with Martin and Hash. We fail to see how such conduct constituted solicitation contrary to the rules of professional conduct. It was merely a showing by petitioner of what the possibilities of recovery were in personal injury cases in order that the prospective client would have a clear understanding of the matter. Petitioner clearly and positively testified that the exhibition of the checks to Mrs. Martell was in response to her request to him for more complete information about such cases. Mrs. Martell's evidence apparently to the contrary is not sufficiently convincing to overcome that evidence. She probably had little recollection of just what took place on the occasion as she was very disturbed about the condition of her sister and brother. The proposed signing of the employment contract and the signing thereof in the case of Hash and Martin, was merely for the mutual protection of the clients and the attorney in order to eliminate any possibility of future misunderstanding. ■ While it may overstep the bounds of becoming modesty for an attorney to inform a prospective client who he justifiably believes desires to retain him, that he is a good attorney, will obtain satisfactory results for the client, and that he has been successful in other cases of a similar nature, such conduct falls short of constituting solicitation as forbidden by rule 2 of the Rules of Professional Conduct. The mere exhibition of the copies of the checks, was nothing more at most than a graphic portrayal of the familiarity with and success in the type of case involved, and certainly is not sufficient evidence of solicitation without other positive evidence that the checks were used as part of a plan to solicit the employment by a stranger who the attorney has no cause to believe is interested in retaining him.

■ We are not unmindful of the fact that the contracts of employment of petitioner as counsel contained provisions for the disbursement by him of such portion of the sum recovered as represented the medical services and hospital expenses. But there is nothing improper in such provisions. They do not indicate solicitation, or an unethical arrangement with the doctor or hospital. It is merely a convenient method

whereby the sums recovered are devoted to one of the purposes for which they were recovered, an element of such recovery being medical and hospital expenses. All too frequently a settlement is made or recovery is had, and the recipient neglects to discharge those obligations. ■ The fact that a loan was made by petitioner to Hash was of slight importance since it was made after petitioner was retained.

For the foregoing reasons we do not believe that the evidence is sufficient to support the charge made against petitioner in the Hash-Martin matter.

## The Gus Meyer Case.

■ On this charge petitioner was accused of having violated rule 3 of the Rules of Professional Conduct, in that he employed one Francis M. Hrubanik, a person not licensed to practice law in the State of California, to solicit and obtain professional employment for him in connection with personal injury cases.

From the record on that matter it appeared that on November 29, 1937, Gus Meyer was struck and injured by an automobile while he was working for a company which was engaged in constructing a highway through the Altamont Pass near Livermore. He was taken to the Livermore General Hospital for treatment. (There is no showing that petitioner was in any way concerned with his being taken to that hospital.) Mr. Meyer testified that after he had been there two or three days Dr. Giubbini brought to see him a man named Hrubanik; that Dr. Giubbini told him that Hrubanik was a friend of his (Dr. Giubbini's) and one of the investigators for a very reliable law firm in Oakland, of which petitioner was a member, "that they would be good people to deal with" and "they would like to take this case"; that on that occasion Hrubanik showed him photostatic copies of checks which assertedly evidenced the amount of different recoveries which the said firm had obtained in other personal injury cases; that he informed Hrubanik that he would have to talk the matter over with his wife before making an agreement as to the employment of an attorney to represent him; that Hrubanik said he could not wait until Mrs. Meyer came to the hospital and that he told Hrubanik that if he would return in a few days he (Meyer) would then advise him of their decision; that Hrubanik came again several days later

at a time when Mrs. Meyer was present; and that he (Meyer) then signed an agreement—which agreement was written by Hrubanik "right there in the room"—in which he authorized petitioner's firm to represent him. Mr. Meyer further testified that prior to the time he signed the said agreement he had not been introduced to petitioner; that he did not ask that Hrubanik call on him, nor did he ever ask any person to procure an attorney for him; that Dr. Giubbini was present during his conversations with Hrubanik; that Dr. Giubbini told him that the driver of the automobile which struck him was covered by insurance; that it was not until three or four days after he had signed the contract that petitioner appeared at the hospital, at which time Dr. Giubbini brought petitioner to him and introduced him as his (Meyer's) attorney; and that he then told petitioner that he had already "signed up" with Hrubanik. The wife of Gus Meyer testified that her husband introduced Hrubanik as "the man . . . that Dr. Giubbini had brought in to see him"; that Hrubanik stated that he represented petitioner's firm, whereupon he proceeded to show her photostatic copies of several checks which assertedly represented the respective amounts of settlements obtained in other personal injury cases; and that prior to that occasion she had never heard of petitioner. The witness Charles Cordano, who as a patient occupied the same room in the hospital with Gus Meyer, testified that he remembered that Dr. Giubbini brought Hrubanik into the room and introduced him as an investigator who represented attorneys; also that he heard Hrubanik tell Mr. Meyer that "he had a very good case, and he could get him a pretty good settlement."

As opposed to the foregoing, petitioner testified that it was he and not Hrubanik who first talked with Gus Meyer. He stated that during the first week that Gus Meyer was in the hospital both he and Hrubanik were working on a case in the vicinity of Fresno; that each left Fresno on Friday evening of that week and that they traveled separately to Oakland; that he, petitioner, stopped at the Livermore hospital that evening and talked with Dr. Giubbini; that prior to that time he knew nothing of the Gus Meyer case; and that Dr. Giubbini then told him that Mr. Meyer wanted an attorney and wanted to see him, and that Dr. Giubbini theretofore had recommended him to Mr. Meyer. Petitioner testi-

fied that he then talked briefly with Mr. Meyer concerning his case; that Mr. Meyer indicated that it was his desire to employ petitioner to represent him but that due to the fact that he, petitioner, was "in a hurry" at the time, he told Mr. Meyer that he would send his investigator to the hospital to investigate the case; that on his return to Oakland he telephoned to Hrubanik and instructed him to go to the Livermore hospital on the following day for the purpose of investigating the Meyer case, but before doing so to call at petitioner's office and secure a proposed contract of employment which Hrubanik was to take with him and which was to be signed by Gus Meyer; that on the following morning Hrubanik telephoned to petitioner from Livermore and stated that he had forgotten to take the contract with him, and that thereupon petitioner dictated over the telephone the contents of the agreement he wished Mr. Meyer to sign. In addition to other evidence introduced by petitioner in support of his testimony, Dr. Giubbini testified that Gus Meyer had requested him to recommend an attorney and that he had recommended petitioner, and that petitioner's first conversation with Gus Meyer took place prior to the time that Mr. Meyer was introduced to Hrubanik. Hrubanik confirmed the testimony given by petitioner as to the manner and circumstances in which he, Hrubanik, had prepared the agreement for Mr. Meyer to sign, and, in addition thereto, denied having shown photostatic copies of checks to Mr. Meyer, or having made any statement to Mr. Meyer to the effect that prior to the signing of the contract he had investigated the facts of the accident. The evidence showed that Hrubanik had been employed by petitioner as an investigator for some time, and that in some instances his compensation therefor was made contingent upon the outcome of the cases on which he worked.

As may be seen from the foregoing, the evidence offered by petitioner is diametrically opposed to that adduced by the other witnesses. However, the evidence preponderates in favor of petitioner. As above stated, the evidence is positive that petitioner was informed by Dr. Giubbini that Meyer desired to consult him professionally. There was no substantial showing of any arrangement between Dr. Giubbini and petitioner. Petitioner testified positively that he saw Meyer about the case *before* Hrubanik called upon him. His

testimony in that respect was corroborated by Dr. Giubbini and Hrubanik. Hrubanik's testimony to that effect was corroborated by men by the name of McKay and Carothers, disinterested witnesses. The latter testified that Hrubanik was in Los Angeles to see him Monday night, the date of Meyer's injury. McKay, who was assisting his friend Carothers in investigating the latter's case in which he was represented by petitioner, testified that petitioner was in and about Fresno, California, from Monday night until Friday, investigating the Carothers case for petitioner. This evidence strongly tends to show that Hrubanik did not call upon Meyer two or three days after Meyer's injury as claimed by Meyer, and prior to the time of petitioner's call, and also that he was not investigating Meyer's case before the Saturday following the Monday of Meyer's injury. It is true that Hrubanik took the contract of employment to Meyer to sign, but that was at the direction of petitioner and after Meyer had agreed to employ petitioner, and the contract was dictated by petitioner. Meyer's claim that Hrubanik called on him before petitioner and solicited the case is rather weak. He was not too sure as to the order in which various calls were made on him by various people the four or five days following the accident. He testified that when petitioner called upon him the latter was in a hurry as he was either going to or returning from Fresno. Although he denied this later in his testimony, it is more reasonable to suppose that his first statement was correct. It coincided with petitioner's testimony. The only showing that petitioner employed Hrubanik to obtain cases for him was by the barest inferences which were squarely contradicted by positive testimony.

Even if Hrubanik's compensation as an investigator may have been contingent on the recovery in a case, that is not vital, as such a contract is proper as long as the investigation is merely to uncover the facts as they actually exist. (*Wilhelm* v. *Rush*, 18 Cal. App. (2d) 366 [63 Pac. (2d) 1158].) Further, Hrubanik's testimony was to the effect that he was paid by petitioner in accordance with petitioner's view of the value of the work he did and was sometimes paid whether or not there was a recovery in the case. It is true that Cordano, a patient in the same room as Meyer at the hospital, testified regarding Hrubanik's call upon Meyer but it does not appear therefrom that Hrubanik

called before petitioner did, and he was rather vague as to what did take place on the occasion of the visit.

From the whole record the evidence is not clear and convincing that petitioner was guilty as charged in relation to the Meyer case. ■ The fact that in the Hash-Martin matter and the Meyer case certain similarities appear is of little consequence. They were totally unrelated. Merely because the same friend may recommend an attorney to several different clients is not of controlling significance.

There remain for consideration the two counts of the order to show cause in which petitioner was charged with having solicited professional employment from Mrs. Vivian Mae Proctor and from Carl L. Bishop, respectively.

### The Proctor Matter.

■ The evidence presented in this matter was conflicting in several material particulars. However, it clearly appears that on or about August 14, 1936, while in the employ of the Western Pacific Railroad Company, one Chester A. Proctor lost his life as the result of a railroad accident. On the day after his death Mrs. Victor Smith, whose husband was a friend of Mr. Proctor's, called on the widow and during such visit recommended petitioner to her as an able lawyer. Thereupon, on the following day and at the request of Mrs. Proctor, petitioner went to her home in Thermalito, California, and had an interview with her, and later in the same day he again talked with her at the home of Mrs. Smith. At her first meeting with petitioner Mrs. Proctor told him that her husband (who in his lifetime had known petitioner) had instructed her to secure the services of petitioner in the event of an accident to him, Mr. Proctor. There was evidence to show that during both of the interviews which Mrs. Proctor had with petitioner she told him that she wanted him to represent her in the matter of her claim against the railroad company but that certain members of her family opposed the bringing of a legal action therefor, and consequently before she entered into a contract to employ petitioner she wished to wait until the inquest was held to see if the railroad company would offer her a settlement. There was also evidence to show that Mrs. Proctor requested petitioner to notify her of the date of the inquest; that on August 24, 1936, the day set for the inquest, petitioner went to her home to notify her of the hearing; that a conversation thereupon

took place between petitioner and Mrs. Proctor, as a result of which she agreed to employ him to represent her, and that thereafter they attended the inquest together. About a month later it appears that, without the knowledge of petitioner and at the insistence of her brother-in-law, Mrs. Proctor, accompanied by the latter, had an interview with representatives of the railroad company, at which time she proceeded to effect a settlement of her claim. Mrs. Proctor testified that on that occasion she was informed that before she could obtain a settlement of her claim it would be necessary for her to discharge petitioner as her attorney; that thereupon a letter directed to petitioner was prepared for her signature by a representative of the railroad company, in which letter petitioner was informed by Mrs. Proctor of his dismissal; also, that at the same time and place she executed an affidavit, the contents of which were prepared by a representative of the railroad company and which were to the effect that petitioner had solicited her case. Petitioner protested to both the claims department of the railroad company and to Mrs. Proctor with respect to their action in settling the case "over his head" and without his knowledge or authority, and thereafter Mrs. Proctor made a statement in her own handwriting—the contents of which had theretofore been discussed with petitioner—in which she repudiated the statement previously made by her in the affidavit to the effect that petitioner had solicited her case. At the hearing before the local administrative committee Mrs. Proctor admitted that some of the statements which she had made in the affidavit were untrue, and that portions of her subsequently written statement in which she had exonerated petitioner from the charge of solicitation were also untrue.

The local administrative committee found that the alleged solicitation took place on August 24, 1936, (the day of the inquest)—whereas the findings of the Board of Bar Governors recite that the date of solicitation was August 14, 1936, the day on which petitioner allegedly had his first conversation with Mrs. Proctor. Also, it appears that the local administrative committee's finding of solicitation was based in part on the charge that Mrs. Proctor's employment of petitioner was induced by his offer to advance money to her. In that regard the evidence showed that, on August 24, 1936, petitioner loaned Mrs. Proctor the sum of $50. Mrs. Proctor

testified that the loan was made before the contract was entered into; petitioner's testimony in that respect is to the contrary. He testified that he did not solicit the case from Mrs. Proctor; that he loaned her the money, at her request therefor, in order to meet pressing needs; and that prior to the time the contract of employment was entered into nothing had been said about Mrs. Proctor's financial condition. However, as hereinbefore has been indicated, during the course of her testimony Mrs. Proctor admitted that she had made untruthful statements both in the affidavit which she had signed at the time of the settlement with the railroad company, as well as in the written statement which she later made in which she denied the truth of her former statement that petitioner had solicited the case. Lacking the testimony of Mrs. Proctor the charge against petitioner must fail, and in view of the conflicts which are to be found in her testimony, as well as the interest which she was shown to have had at the time and under the circumstances in which she made the affidavit wherein she accused petitioner of solicitation—together with other facts and circumstances shown by the evidence—her statements with regard to the question of solicitation are not entitled to receive full credit as against those made by petitioner and his witnesses. Moreover, there was evidence in the record to show that Mrs. Proctor was rendered penniless by the death of her husband and that, according to two witnesses, on the day following his death she was without funds with which to meet even the minor expense of a telephone call to petitioner. If that testimony is to be believed, it is not unreasonable to believe as true the testimony of petitioner that Mrs. Proctor requested the money to meet urgent demands.

### The Bishop Matter.

The charge on the fourth count is that of solicitation of professional employment by petitioner of one Carl L. Bishop, on or about January 5, 1938, and March 6, 1938, in connection with a railroad accident which occurred in Arizona in November, 1937, as a result of which Bishop, an employee of the Southern Pacific Company, suffered the loss of an eye. It appears that about a month after his injury Bishop had an interview in Phoenix, Arizona, with one A. H. Strasser, a local officer of the Brotherhood of Railroad Train-

men, with regard to Bishop's asserted claim for damages against the railroad company; that Bishop, who was then on his way to San Francisco where he expected to receive treatment at the Southern Pacific Hospital in that city, was informed by Strasser with respect to the Legal Aid Department of the Brotherhood and of the fact that petitioner herein was regional counsel of said brotherhood; that at Bishop's request therefor Mr. Strasser gave him petitioner's name and address; and that, also at Bishop's request, shortly thereafter Strasser wrote a letter to petitioner at his office in Oakland, California, in which he requested petitioner to communicate with Bishop at the hospital in San Francisco. Thereafter, and on or about January 5, 1938, in accordance with Bishop's request that he call upon him, petitioner talked with Bishop at the hospital concerning his injuries, and discussed with him the question of presenting Bishop's claim to the railroad company. However, on that occasion no contract for the employment of petitioner as attorney for Bishop was entered into, but at the instance of petitioner Bishop was then examined by doctors other than those at the hospital in order to determine the extent of his injury, after which petitioner advised Bishop not to present his claim at that time but to wait until the "progressive" condition with respect to his injury could be ascertained. According to petitioner's testimony, Bishop then stated that he desired to see petitioner at a later time. On the following day Bishop returned to his home in Globe, Arizona. About two months later petitioner informer Strasser, at Tucson, Arizona, that he, together with an investigator for the Brotherhood of Railroad Trainmen, intended to be in Arizona shortly in connection with litigation which petitioner was conducting in that vicinity, and thereupon Strasser communicated with Bishop and suggested that he meet petitioner in Tucson. Thereafter Bishop went to Tucson, and on learning that petitioner would be delayed in his arrival Bishop returned to his home in Globe. After petitioner had arrived in Tucson, and as a result of a telephone converation held between Strasser and Bishop concerning petitioner's presence in Arizona, Bishop expressed a willingness that petitioner call on him at his home in Globe. On or about March 5, 1938, accompanied by an investigator for the Brotherhood of Railroad Trainmen, petitioner called on Bishop, and, according to petitioner's testimony, Bishop

"seemed to be all ready to have me handle the case as soon as I saw him," but that he expressed the desire that petitioner first discuss the case with his wife. On the following morning petitioner had an interview with Bishop and his wife, at which time Bishop entered into an agreement to employ petitioner to represent him in seeking to collect damages for his injury. On that occasion Bishop advised petitioner that he had been offered a settlement by the railroad company in the sum of $6,500—whereas there was evidence to show that, in fact, he had been offered the sum of $5,500. It was agreed that petitioner's compensation was to be based on the amount of money which he might be enabled to obtain in excess of that theretofore offered to Bishop in settlement. Thereafter, through petitioner's efforts a settlement was offered to petitioner in the sum of $8,500. However, after Bishop had learned of the increase in the amount offered in settlement, and admittedly in order to avoid paying an attorney's fee to petitioner, he sought to discharge petitioner as his attorney. In pursuance of that purpose Bishop threatened to and did lodge a complaint against petitioner with the Bar Association (which complaint that body refused to entertain) to the effect that petitioner had solicited the case from him. However, on petitioner's claim that he was entitled to a proper fee for his services Bishop agreed to and did pay petitioner therefor. Shortly before the settlement was effected on Bishop's behalf, petitioner requested Bishop to sign a statement indicating the manner in which the contract between them had been entered into, and it was shown that after Bishop had approved the language thereof he signed the said statement—in which he asserted, in effect, that petitioner had not solicited employment by him but that he, Bishop, had voluntarily entered into the contract.

The findings of the local administrative committee and of the Board of Bar Governors recite that the alleged solicitation of Bishop occurred on or about March 5, 1938; also that the charge of solicitation was predicated, in part, on the fact that petitioner had offered to loan money to Bishop.

The evidence shows that during the conversation had on March 6, 1938, with Bishop and his wife, petitioner exhibited some photostatic copies of bank checks indicating various amounts of recoveries as well as data relative to damage actions which previously had been conducted by petitioner;

also, that at that time petitioner agreed to loan Bishop a sum of money monthly to meet his living expenses pending the outcome of the case. At the hearing before the local administrative committee Bishop testified that petitioner had solicited the case and that his statements to the contrary, which he had theretofore made in writing, were not true. It was stipulated that the testimony of Mrs. Carl Bishop would have been the same as that of her husband. Petitioner testified that he did not solicit the case either through display of the checks or by offering to loan any money, but that Bishop said "they didn't have any money in the house and they were up against it, and he wondered if I could let him have a little money"; also, that "He (Bishop) told me he wanted me to explain the matter (of presenting Bishop's claim) to his wife. I did. I told her about these doctors, showed them some photostatic checks of cases where the company had sent the man back to work . . . where autopsies revealed they had (other) injuries . . . and I told her all about Federal Employers Liability Act and tried to make clear to her what it was all about. Finally she said it was all right, whatever her husband wanted to do. He said, 'Fine. Go ahead. I want it investigated right way'." In addition to that introduced by petitioner, there was other evidence to show that following his injury Bishop had been in indigent circumstances and that others had given and loaned him funds for his immediate needs. The investigator for the Brotherhood of Railroad Trainmen, who was with petitioner at the time the agreement to employ petitioner was entered into, made the following statement in an affidavit which was received in evidence: "Bishop asked for Hildebrand's advice on the matter (of his claim) and Hildebrand gave it . . . it is not correct, however, that Hildebrand . . . 'importuned him to handle the case' as Bishop was entirely satisfied with the suggestions made in response to his request for advice."

The question thus squarely presented in the Bishop matter is whether—in the light of all the facts and circumstances hereinbefore detailed, and considering the conflict in the testimony given by the respective witnesses—it can fairly be said that petitioner was guilty of having solicited the case, on or about March 5, 1938.

However, in the Bishop matter, the evidence is conflicting with regard to the question whether either of those acts was

in fact performed for the purpose of soliciting employment; also, there were other facts and circumstances shown to have been present in connection with that matter which raise a serious doubt as to whether the employment was in fact solicited.

In proceedings of this character where the evidence is conflicting, as was shown to be the fact herein, the findings of the local administrative committee and of the Board of Bar Governors are not necessarily binding on this court. (*In re Petersen,* 208 Cal. 42 [280 Pac. 124]; 9 Cal. Jur. 10-Year Supp., p. 440.) Also, in the present proceedings where it is apparent that the testimony given by each of the principal witnesses in support of the charges in the Proctor and Bishop matters was shown to have been in itself not only conflicting and contradictory but colored by self-interest and animosity, the evidence cannot be said to be of that clear and convincing nature which is necessary to establish a finding of culpability on the part of the accused. (*Furman* v. *State Bar,* 12 Cal. (2d) 212 [83 Pac. (2d) 12]; *Bar Association of San Francisco* v. *Sullivan,* 185 Cal. 621 [198 Pac. 7].) Charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty, and any reasonable doubts should be resolved in favor of the accused. (*Golden* v. *State Bar,* 213 Cal. 237 [2 Pac. (2d) 325]; *Aydelotte* v. *State Bar of California,* 209 Cal. 737 [290 Pac. 41].)

There is no contention that petitioner failed to give proper attention and care to the cases and his client's interests. The results obtained and services rendered were satisfactory.

As hereinbefore has been indicated, it is the conclusion of this court that none of the charges set forth in the order to show cause was sufficiently supported by the evidence.

It, therefore, is ordered that the charges against petitioner should be, and they are, hereby dismissed.