[S. F. No. 14118. In Bank.—July 30, 1931.]

FRANK J. GOLDEN, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

William P. Hubbard for Petitioner.

J. W. Hawkins, Joe G. Sweet and Philbrick McCoy for Respondent.

THE COURT.—This is a proceeding to review the action of the board of governors of The State Bar recommending that the petitioner be disbarred.

The board found the petitioner guilty of misappropriation of funds entrusted to him as trustee and while acting in the dual capacity of attorney and trustee for Mary

Cynthia Gesford Lott. The petition is based mainly on the contention that the evidence before the board is wholly insufficient to support the findings and conclusion of the board. Preliminarily certain other contentions may be disposed of briefly.

■ The proceeding was initiated by issuing and serving upon the petitioner an order to show cause, preceded by an informal complaint made against him. It is insisted that a complaint in writing duly verified is essential to prosecution of the charge. This is not so. (*Herron* v. *State Bar,* 212 Cal. 196 [298 Pac. 474].)

Ten members of the board participated in the hearing. Eight of the ten made the findings and recommendation for disbarment. Two dissented, one of whom filed a dissenting opinion stating his conclusion that the evidence was wholly insufficient to support the findings upon which the recommendation was made. The other joined in the dissent. It is contended that the accused was entitled to the active participation of the entire board. We do not so conclude. In the absence of a controlling authority to the contrary, and none has been cited, the concurrence of a majority of all of the members of the board would seem to be sufficient. The dissenting opinion was not made a part of the return. It should have been returned as this court is entitled to the views of those members of the board who do not concur in the majority action if they desire to express them in a dissenting statement or opinion.

■ The hearing was had before local administrative committee No. 3 of the city and county of San Francisco, and was heard *de novo* by the board of governors. It is contended that two of the majority members of the board acted as prosecutors; that they thereby disqualified themselves to sit in judgment and participate in a recommendation. The nature of the proceedings requires that someone elicit the facts. This may be done by any or all of the members present and we see no impropriety in the designation of a certain member or members to undertake that task. From a practical standpoint such must be the proper procedure, otherwise the investigation would get nowhere unless an outside member of The Bar be designated to act for and on behalf of the board, which should not be

required in view of the limited powers of the board as investigators of fact.

We find no ruling on the part of the local administrative committee or the board of governors with reference to the admission and production of evidence which has worked to the prejudice of the petitioner. We then come to a consideration of the alleged insufficiency of the evidence to support the recommendation and justify disbarment. or other disciplinary order.

Mrs. Lott formerly resided in Napa County. Her name was Mary Cynthia Gesford. Her near living relations are a brother, Henry C. Gesford, a former judge of the Superior Court of Napa County; a sister, Lillian Johnson, of San Francisco; a sister, Louisa J. Gesford, of San Francisco; a nephew, Charles P. Hunt, residing in Alameda County but engaged in business in San Francisco, and a cousin, Ada W. Neal, a business woman residing in San Francisco. At the time of the investigation under review Mrs. Lott was a widow of the age of seventy-two years. Her husband died in 1925. She had been in poor health for many years, resulting in large measure from the attention and care given to her husband during his declining years. She had known Frank J. Golden, the petitioner, for about forty years, their acquaintanceship having extended from the petitioner's boyhood days in Napa County. For many years prior to her husband's death, and for some time thereafter, she had been at times in straitened circumstances. The petitioner had befriended her in many ways, had advanced money to her for her livelihood when she could obtain means from no other source. He had also acted as her attorney in several lawsuits and she had implicit confidence in him.

Some time prior to June, 1926, Mrs. Lott was apprised of the fact that she would receive a considerable sum of money from what is called the Jennings estate then under administration in Cook County, Illinois. Each of the Gesfords, brother and sisters, were to receive equal shares. Mrs. Lott desired to have someone to receive and manage this fund for her. Very naturally, it would seem, she went to the petitioner, whom she often referred to as the best friend she had in the world, and requested that he take charge of it, as her trustee. He suggested that some member of her

immediate family act in that capacity. Her relationship with her brother and her sisters was not cordial. She refused to accede to the suggestion and insisted upon the petitioner undertaking the task. She was, however, in close and friendly relationship with her nephew, Mr. Hunt, and her cousin, Mrs. Neal, both of whom were substantial business people and with whom she consulted with reference to her plans. They were in accord with her in her plan to have the petitioner handle the fund and he accepted the responsibility. Accordingly Mrs. Lott executed to the petitioner an assignment of her interest in the Jennings estate. Shortly thereafter and under date of June 26, 1926, a declaration of trust was executed, signed by both petitioner and Mrs. Lott, in which it was provided, among other things, that as soon as the funds should come into his hands the trustee should pay therefrom such obligations and debts of Mrs. Lott as she and the trustee should determine were justly due; that the trustee should keep the trust funds invested in income producing securities, mortgages or deeds of trust and after paying all debts and other expenses of handling the fund, should pay out and distribute the income from the fund, first by the payment to Mrs. Lott of $300 or more per month, provided that if the income from the fund should be insufficient said payment should be made from the principal; that the trustee should pay such further sums to Mrs. Lott as should be mutually agreed upon; that the trustee agrees that the income shall be not less than six per cent per annum on the unexpended balance and that if the income should be less than six per cent, the trustee shall make up the difference from his own funds; that if the income should exceed the six per cent, the excess should be retained by the trustee as full compensation for administering the trust, including attorney's fees in litigation, if any, affecting the trustor or the trust estate; that the trustee should be liable for any and all losses that might be sustained by the trust estate, either to principal or interest while the trustee continued to act as such; that upon the death of the trustor the trustee should pay the balance remaining in the fund as directed in the declaration and in accordance with written instructions to be thereafter given by the trustor. The form of this agreement was submitted to Judge Gesford and other relatives of Mrs. Lott and

no objection was raised by them or any of them as to the sufficiency or propriety thereof. The agreement was also submitted to and approved by an eminent member of the bar of San Francisco employed by Mrs. Lott for that purpose.

On June 26, 1926, Mrs. Lott, by letter, gave to the petitioner written instructions to pay to numerous friends and relatives the entire trust estate, after her death, with the residue to her nephew, Mr. Hunt, and to her cousin, Mrs. Neal, and the latter's husband, share and share alike. The instrument took the form not only of written instructions but also of a direct assignment to the beneficiaries therein named. In order to confirm these instructions and assignments and to make the terms thereof more certain, the petitioner and Mrs. Lott, under date of June 27, 1926, executed a formal instrument to that effect, carrying out in detail the desire of Mrs. Lott, but in nowise altering the substance and effect of the original trust agreement except that the trustee thereunder should pay to the petitioner the sum of $450 per month.

In the order to show cause served on the petitioner he was charged with entering into an unconscionable agreement with his trustor. The local administrative committee, upon a consideration of the proof, decided not to press this charge. The board of governors have not pursued nor found upon that phase of the charge and it is not argued in the briefs. For that reason it may be considered as removed from consideration in this proceeding. The controversy is then narrowed to the question of the sufficiency of the evidence to support the findings of the board to the effect that the petitioner has violated his trust in maintaining an inconsistent position and in investing the trust funds to his own profit and in failing properly to account to the trustor upon the termination of the trust.

In July, 1926, the petitioner received from the estate of Jennings by a remittance from Chicago a check in the sum of $53,334. In September of the same year he received the sum of $11,893 as Mrs. Lott's distributive share of the estate of her deceased sister, Rebecca F. Gesford, which estate consisted of the portion of the Jennings estate coming to the deceased sister, and in February, 1929, the petitioner received the further sum of $699.38, the balance due the

trustor from the Jennings estate. He thus received into the trust fund the sum of $66,016.38.

From the time of the receipt by the petitioner of this money Mrs. Lott was furnished money sufficient to keep her in comfortable and at times luxurious quarters and surroundings. She had a companionable nurse who ministered to her wants. She improved in health, gained in weight, appeared happy and contented and made no complaint of the administration of the trust fund by the petitioner or of the amount of the payments therefrom made to her or on her behalf except as hereinafter related.

Mrs. Lott for some time lived at the Leamington Hotel in Oakland. While residing there and in the early part of 1929 she met one Harry Cobb and one Eva K. Walters. Mrs. Lott had not known Cobb before and from the record he is shown to be of a lawless and designing character. Mrs. Lott and Mrs. Walters had apparently met before and Mrs. Walters knew much about the personal and family relationship of Mrs. Lott and of the fact that the latter had come into funds. Cobb and Mrs. Walters established themselves in the good graces of Mrs. Lott and began to exercise a dominating influence over her, and seemingly gained complete control over her. About March or April, 1929, they abducted her from or persuaded her to leave the Leamington Hotel and prevented her from communicating with the petitioner. Cobb and Mrs. Walters had interested themselves in the financial affairs of Louisa J. Gesford, who was about eighty years of age at the time she received her allotment of the Jennings estate, and as a result of their activities, so the record shows, the funds of the elderly Louisa were dissipated to a large extent. They persuaded Mrs. Lott that the petitioner was mishandling her estate, caused her to make the complaint before the local administrative committee, had themselves appointed guardians *ad litem* and as such and on behalf of Mrs. Lott brought an action against the petitioner for money had and received and caused an attachment to be levied on the petitioner's property. This action is now at issue and is pending in the Superior Court in and for Los Angeles County. They also brought proceedings in the San Francisco Superior Court to have Mrs. Lott declared incompetent to handle her own affairs. Cobb brazenly stated to Mrs. Neal that the motive behind his activities was financial

gain to himself. The record shows without conflict that Cobb and Mrs. Walters were interlopers and were concerning themselves with Mrs. Lott's affairs notwithstanding the fact that neither Mrs. Lott nor any of her relatives nor those who would benefit by the safe administration of the trust or would lose by its maladministration made no complaint against the petitioner and notwithstanding the fact that Mrs. Lott continued to place confidence in the petitioner and that Mr. Hunt and Mrs. Neal opposed the appointment of a guardian for Mrs. Lott's estate. The antagonism thus engendered between Cobb and Mrs. Walters on the one hand and the petitioner on the other has an important bearing on the reasons for the means employed later on the part of the petitioner to thwart the purposes of Cobb and Mrs. Walters, which point unerringly to a consistent endeavor to obtain control of Mrs. Lott's money.

At the hearing before the local administrative committee and also before the board it developed that the petitioner had invested the first moneys received by him from the Jennings estate in the sum of $51,000 and accrued interest in promissory notes, totaling in all approximately the amount originally received by the petitioner, secured by a second trust deed on the Leamington Hotel property and by a chattel mortgage on the equipment of the hotel. Straus & Company held a first trust deed as security for the payment of notes totaling $835,000. The second trust deed was security for several notes totaling some $75,000 which were executed by the hotel company to one Hengen, who was the owner of the real property on which the hotel was built and said second trust deed notes were issued to represent the purchase price of the realty. The improved property was appraised by Straus & Company at $1,500,000. It was also appraised by A. H. Reed & Sons to the commissioner of corporations for the purpose of the issuance of a permit at $1,753,500, including the value of equipment, furniture, fixtures, machinery, etc. The petitioner believed and on the record would seem to have been justified in believing that the second trust deed notes so purchased by him were amply secured. The transaction was called in question by the local administrative committee and by the board of governors by reason of the following facts: The petitioner had become interested in the promotion of the Leamington Hotel

enterprise and was an officer and director of the corporation. He had invested some $40,000 of his own funds in the common stock of the hotel company long before he entered into the trust agreement. He acquired and owned 43⅓ per cent of the common stock of the company. He purchased the second trust deed notes from one Howard H. Bru, a man of substantial business interests and financial responsibility in the San Francisco bay section. Mr. Bru had purchased the $75,000 second trust deed notes from Hengen. The record is not clear as to how much Bru paid for these notes and the inference from the evidence is justifiable that he purchased them at a discount with the aid of the petitioner. The findings of the board are to the effect that the petitioner bought $51,000 of said notes at par with accrued interest when he should have brought them at a discount if Bru bought them at a discount and that a loss to the trust estate resulted; and the inference is drawn that either the petitioner profited personally by the transaction or that he permitted Bru to gain thereby an unconscionable profit at the expense of the trust estate. Without going into detail there is ground for suspicion that the transaction was not in all respects regular, but the evidence is undisputed that the petitioner finally sold the $51,000 trust deed notes to one Herman Schumacher for approximately the face value thereof and thus recovered to that extent the *corpus* of the trust in cash.

The accounting feature of the present investigation will now be considered. The local administrative committee and the board of governors went into that subject. The petitioner refused to testify before the local committee as to certain features of the accounting and as to the location of the trust funds. He did this, so he claimed, for the reason that any disclosure there made would become known and enable the so-called Cobb-Walters group further to harass him and permit them to impose on Mrs. Lott. However, he made disclosure as to these matters before the board of governors. He there claimed and now vigorously insists that he has accounted for every dollar of the funds entrusted to his care and has paid over to Mrs. Lott the balance remaining in the fund and obtained a full release from her. In support of his contention he produced his account showing receipts and expenditures which he had theretofore sub-

mitted to Edward S. Bell, an attorney independently employed by Mrs. Lott for the purpose, which account was approved by Mr. Bell in writing appended to the account. This account is not as full and complete as it should be as to the particular purposes for which cash expenditures were made and it may be freely stated that the petitioner is subject to criticism by reason thereof, but the record is devoid of evidence sufficient to support a finding that the account does not represent the facts.

The petitioner also presented to the board a written agreement of settlement, of date June 14, 1930, signed by himself and Mrs. Lott, and approved in writing by Edward S. Bell as Mrs. Lott's attorney, wherein the history of the trust transaction was briefly recited and wherein it was agreed between the parties that the balance in the trust fund properly chargeable to the petitioner was the sum of $50,117.54; that the petitioner should pay to Mrs. Lott the sum agreed to be the trust balance and that upon payment thereof the petitioner would be fully discharged. The petitioner also presented to the board a receipt, dated June 17, 1930, signed by Mrs. Lott acknowledging payment to her of the sum agreed upon.

The majority of the board found that the petitioner did not pay to Mrs. Lott on the seventeenth day of June, 1930, or at any other time, said sum of $50,117.54, or any part thereof; that he converted said sum to his own use, and concluded that he was guilty of misappropriation of funds entrusted to his care—conduct involving moral turpitude. The board refused to believe that the petitioner paid the money as shown by said receipt, apparently on the ground that it was paid, as petitioner testified, in currency, and therefore his testimony was inherently improbable and unworthy of belief. The petitioner testified that when the agreement of settlement of June 14th was made with Mrs. Lott he was prepared and offered to pay the amount in cashier's checks and cash, but that Mrs. Lott refused to accept any checks, stating that she was afraid that Cobb and Mrs. Walters and those working on their behalf to have her declared incompetent to handle her own affairs would get possession of the same and that she wanted cash, only, in order that she might invest the same in gilt-edged bonds on her own behalf. The petitioner was corroborated by docu-

mentary evidence to the effect that he had in his possession immediately prior to the final settlement seven cashier's checks for $5,000 each which he was prepared to deliver to Mrs. Lott. When she refused to accept them he testified that he cashed them and delivered the proceeds therefrom, together with $10,000 that he had in his safe and sufficient in addition from his bank account to make the full payment to Mrs. Lott at his brother's home in Oakland on the afternoon of June 17th. There is no evidence in the record contradicting the testimony of the petitioner in this respect or dispelling the genuineness of the written receipt, excepting only the circumstances that the money was paid in cash. This circumstance gives rise on this record to no more than a suspicion, surmise or conjecture. The fact that the board did not believe the petitioner's testimony is not enough. Their disbelief must be founded on evidence sufficient to support a finding against the accused. ▇ This proceeding is *quasi* criminal in its nature, and while it is not essential that the proof of guilt be established beyond a reasonable doubt, yet the charges must be sustained by convincing proof to a reasonable certainty and any reasonable doubts should be resolved in favor of the accused. (*Bar Association of San Francisco* v. *Goldman,* 53 Cal. App. 42 [199 Pac. 836].) The burden of proof was on the accuser. ▇ The testimony of the accused as to the accounting and final payment was uncontradicted except by the circumstances related which in and of themselves are insufficient to brand his statements (corroborated as they are by documentary evidence and the approval of an independent attorney for Mrs. Lott as to the accounting and by a written receipt as to payment), as inherently improbable, and are insufficient to support a finding of guilt.

It is insisted that when the money was paid on the final settlement the petitioner knew that Mrs. Lott was undergoing investigation in the superior court as to her competency to handle her own affairs, and that the payment to her of such a large sum of money under such circumstances was a wilful neglect of duty on the part of the petitioner, especially since it appears that Mrs. Lott was declared incompetent two days after the payment. It is undisputed on this record that Mrs. Lott was under the baneful influence of Cobb and Mrs. Walters from March to November,

1929. It was during this time that the present proceeding was started for the avowed purpose, on the part of those urging Mrs. Lott to institute the charges and obtain control of Mrs. Lott's funds, of compelling the petitioner to surrender them. It is significant that none of the relatives of Mrs. Lott objected to the petitioner's handling of the trust funds even after the charges were brought against him before the local committee or after suit was brought against him to recover the money or after the incompetency proceedings were initiated. It would seem that if any objection to the petitioner's course were to be made it would be by those interested in the residue after the death of Mrs. Lott. On the contrary, Mr. Hunt and Mrs. Neal at all times have allied themselves with the petitioner, testifying in his behalf in this matter and resisting the incompetency proceedings. Furthermore, Mrs. Lott filed an affidavit with the board objecting to the findings of the local administrative committee and in opposition to its recommendation, reaffirming her confidence in the petitioner, declaring her entire satisfaction with the way he had administered the trust fund; that he had made payments to her therefrom as required and expressing her desire that he continue in his capacity as trustee. After this matter had been taken under submission by the board of governors and ten days before their findings and recommendation were made and filed, the board received a three-page letter from Mrs. Lott, posted at San Diego, and entirely in her own handwriting, again reaffirming her confidence in the petitioner, stating that she had received the 50,000-odd dollars on June 17, 1930; that the money had been invested by her in bonds which she theretofore stated were bonds of the Great Western Power Company, the Pacific Gas and Electric Company and the Southern California Edison Company, and that said bonds were in her safekeeping; that she had not willingly made the charges against the petitioner, but had been influenced so to do by Mr. Cobb; that she would gladly give her deposition to substantiate her statements if the same were desired, and if so to get in touch with her attorney, Mr. Edward S. Bell, Latham Square Building, Oakland.

The foregoing affidavit with reference to the recommendations of the local administrative committee and the letter from Mrs. Lott above referred to, may not be said to be

evidence in a strict sense, but they suggested a field of investigation which in fairness to the petitioner should have been entered upon in view of the fact that the burden of proof was upon the board to establish by convincing evidence the guilt of the accused.

■ The board further found that the petitioner had sworn falsely as to material matters. No specification of the particulars in which he is declared to have committed perjury are incorporated in the findings. From the briefs it is disclosed that in two instances he is claimed to have sworn falsely. The first is a statement or statements incorporated in an affidavit executed by the petitioner and filed in the case of the *Scott Company et al.* v. *Oakland Title Insurance and Guaranty Company,* wherein the petitioner denied that while he was acting as attorney for Howard H. Bru he received a large or any sum of money in which said Bru was interested or which in any way appertained to said second trust deed and denied that he had made any personal profit in the transaction whereby said Hengen assigned said second trust deed to Bru, and denied that any of his own money was invested in said trust deed or that he expected to gain a profit for himself in the transaction. Aside from the fact that the denials in the affidavit were not in contradiction of anything testified to by the petitioner before the board it may be said that the petitioner was not charged with an offense relating to this matter in the order to show cause (see *San Francisco Bar Assn.* v. *Oppenheim,* 186 Cal. 75 [198 Pac. 1069]), and it cannot be said from the evidence whether the denials were true or false.

The second matter related to the sworn statement of the petitioner when he was being examined upon supplementary proceedings in connection with an endeavor to collect a judgment against Mrs. Lott. He testified that he had no funds in his possession belonging to Mrs. Lott. This was at a time when he was in possession of the trust fund. The petitioner sought to justify his statements upon such examination upon the ground that Mrs. Lott had theretofore assigned in writing her entire interest in the trust funds to friends and relatives, reserving to herself only the right to the monthly payments during her lifetime. On the facts it is an exceedingly debatable question whether Mrs. Lott, in view of the assignment, could have compelled, as against

the objection of the assignees, the payment to her of any more than the monthly allowance, and the petitioner testified that at the time of his said examination in supple-, mentary proceedings Mrs. Lott had been fully paid up to that time under the contract. We see no reasonable basis for the finding of false swearing on the part of the petitioner under the evidence here presented.

The action against the petitioner in Los Angeles County was at issue when the petitioner was examined before the board and is still pending. In that action the question of the validity of the trust agreement and the sufficiency of the accounting are involved. At all times the petitioner has been willing to have an adjudication in that case. On one occasion he went accompanied by his present attorney from San Francisco to Los Angeles for the purpose of trying the case, but the cause was continued because no department of the court was available to try the same. Anything said in this opinion, or the conclusion herein reached, should not be taken or considered as an adjudication of the issues involved in that litigation. The only effect to be ascribed to our determination in the present matter is that the evidence before us is insufficient upon which to base an order of disbarment or of suspension from practice.

In view of the pendency of the action in the Superior Court in and for Los Angeles County, and in view of the unsatisfactory state of the record herein, we think this proceeding should be dismissed without prejudice, to await the determination of the issues in said pending action.

It is so ordered.