[L.A. No. 31849. Mar. 7, 1985.]

W. MIKE McCRAY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

W. Mike McCray in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Lawrence C. Yee for Respondent.

**OPINION**

**THE COURT.**\*—This is a proceeding to review a recommendation of the Review Department of the State Bar Court that petitioner be disbarred. The findings underlying the recommendation essentially were that petitioner failed to render his client a full accounting for $89,000 received in settlement of a lawsuit, and that out of the settlement proceeds he commingled and misappropriated almost $6,000 which he had agreed to transmit to the Internal Revenue Service in satisfaction of the client's tax obligations and further misappropriated a lesser amount payable to the client. The hearing panel unanimously recommended that petitioner be put on probation for three years, with six months actual suspension from practice, subject to his making restitution and fulfilling other conditions. The review department advises this court that its recommendation of disbarment, made by a vote of eight to two, stemmed from a conclusion that the hearing panel had given insufficient weight to petitioner's prior record of discipline. We shall conclude that one of the findings on which discipline was recommended is unsupported by convincing proof to a reasonable certainty, that under all

---

\*Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Arguelles, J.†

†Assigned by the Chairperson of the Judicial Council.

the circumstances, disbarment would be overly harsh, and that we should instead order five years of probation conditioned on one year of actual suspension together with restitution.

Petitioner was admitted to practice in 1950. In 1975 he was retained by William Daniel, president and principal stockholder of Uneedus Corporation, to sue California Shopper, a competitor of Uneedus in the advertising newspaper business, for unlawful business practices. Petitioner obtained a judgment for Uneedus in the trial court in December 1977, and after successfully appealing on the ground that the damages should have been trebled, negotiated the settlement for $89,000 in December 1978. The settlement was consummated by petitioner's filing a satisfaction of judgment in exchange for three checks totaling $89,000, all dated December 12, 1978, and drawn by Great Western Savings and Loan Association, as follows: (1) a check for $44,018.74 payable to "Uneedus, a Corporation"; (2) a check for $5,943.64 payable to petitioner "as trustee (I.R.S.)"; and (3) a check for $39,037.62 payable to petitioner and Citizens Bank of Costa Mesa. The State Bar examiner introduced into evidence photocopies of the front and back of each check, which had been certified and produced by Great Western's custodian of records in response to a State Bar Court subpena.

The charges against petitioner all pertain to his handling of those three checks and their proceeds. The only witnesses before the hearing panel were the client, William Daniel, and petitioner, who acted as his own counsel. At the time of the hearing in January 1983, Daniel was a resident of Missouri, having moved there from California in December 1977. By 1978, Uneedus' business was no longer in operation.

### CHECK PAYABLE TO UNEEDUS

The agreement by which petitioner was retained provided that his fee would be 40 percent of any sums recovered, including any fees awarded by the court. The check for $44,018.74, payable to Uneedus, was the balance of the settlement proceeds remaining after subtracting the amounts of the check for payment of Uneedus' tax obligations and the check for petitioner's fees and costs. Petitioner testified that he told Daniel he was having the client's share of the settlement paid directly to Uneedus by cashier's check to avoid the "routine" that would be necessary if a single check were made payable jointly to attorney and client for the total amount due both of them. Petitioner further stated that he sent the Uneedus check to Daniel by express mail because Daniel had said he was anxious to get it before Christmas.

Daniel testified as follows: He never did see the original of the Uneedus check and did not see even a photocopy of it until 1982 when he received

a copy from petitioner's attorneys. On December 9, 1978, petitioner telephoned that the case had been settled. Daniel subsequently received a check for $43,008.06 (not $44,018.74) drawn on petitioner's general account (not trust account). Daniel's only written record of receiving the latter check was a notation in his checkbook of a deposit on December 22, 1978, of $43,008.06, for which he received immediate credit (rather than the check's being held for collection). He had been unable to find his copy of the deposit slip, which would have shown the check's bank number, but he denied that the amount of the deposit was the sum of a check for $44,018.74 less cash. As for the Great Western check to Uneedus for $44,018.74, Daniel testified that the indorsement on the back "appears to be my signature, but I never signed the check. I would say it was probably a photocopy from something . . . . [I]t looks like a photocopy of my signature."

The copies of the front and back of the Uneedus check produced by Great Western show that the check was drawn by Great Western on December 12, 1978, with Union Bank, in Los Angeles, as "agent." The only two indorsements shown on the back are (1) "Uneedus—Bill Daniel" and (2) "Paid—Union Bank—Los Angeles, CA" dated December 27, 1978. The State Bar suggests no explanation for how the Uneedus-Daniel indorsement could have appeared on the back of the check other than in the course of the check's being negotiated through the banking system, in light of the fact that the copy in evidence came directly from the business records of Great Western.

There is no indication that the State Bar made any effort to obtain the original of the Uneedus check from Great Western so as to ascertain whether Daniel's apparent indorsement was, as he claimed, "a photocopy of my signature" and to discover any other significant markings that were not reproduced in the photocopy. Nor does there appear any attempt by the State Bar to seek bank records that might establish the existence of a check drawn by petitioner for $43,008.06, testified to by Daniel.

On the foregoing evidence the hearing panel found: "[The] check (#26-0017361) made payable to Uneedus Corporation in the sum of $44,018.74 was received by [petitioner]. William Daniel did not endorse said check. Said check was negotiated. William Daniel received, on behalf of Uneedus Corporation, the sum of $43,008.06 paid in the form of a check drawn on [petitioner's] account." Besides making that finding, the panel included the $1,010.68 difference between $44,018.74 and $43,008.06 in the amounts that it recommended requiring petitioner to repay to Daniel as a condition of probation.

The review department not only adopted the foregoing finding but added that the check was negotiated "by [petitioner] without authority from Wil-

liam Daniel.'' It further added: ''[Petitioner] did not account to William Daniel for the $1,010.68 difference between the $44,018.74 check received and the $43,008.06 check paid and [petitioner] misappropriated said $1,010.68.''

The review department's findings which the hearing panel refrained from making—that it was petitioner who negotiated the Uneedus check and that he misappropriated the $1,010.68 difference—raise further factual questions. Daniel testified that he deposited a $43,008.06 check from petitioner on December 22, 1978; yet the photocopy of the back of the Uneedus check for $44,018.74 shows it did not clear Union Bank until December 27, five days later. Petitioner testified he did not have the funds to back the $43,008.06 check described by Daniel, and though the hearing panel was not required to accept petitioner's testimony, there remains no explanation of why he would issue that check without first obtaining the proceeds of the Uneedus check. It is true that the other two settlement checks, which were indorsed by petitioner and cleared on December 15, totaled almost $45,000, but one of them, which was for $39,037.62, was made payable jointly to petitioner and his bank, and there is no basis for disbelieving petitioner's testimony that the purpose of the joint payability was to facilitate discharge of petitioner's debt to the bank for a loan.

The principles governing our review of the findings of the hearing panel and the review department are well settled. ■ The findings are not binding on this court, and we must independently weigh the evidence and make our own factual determinations. (*Mayo* v. *State Bar* (1978) 23 Cal.3d 72, 74 [151 Cal.Rptr. 345, 587 P.2d 1158].) ''[W]hile it is not essential that the proof of guilt be established beyond a reasonable doubt, yet the charges must be sustained by convincing proof to a reasonable certainty and any reasonable doubts should be resolved in favor of the accused.'' (*Golden* v. *The State Bar* (1931) 213 Cal. 237, 247 [2 P.2d 325]; accord, *Hildebrand* v. *State Bar* (1941) 18 Cal.2d 816, 834 [117 P.2d 860]; *Furman* v. *State Bar* (1938) 12 Cal.2d 212, 229 [83 P.2d 12].) The findings of the panel and review department must be given great weight and the burden is on petitioner to show that they are erroneous (Bus. & Prof. Code, § 6083, subd. (c); *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993]), but that burden may be met by a demonstration that the charges of unprofessional conduct are not sustained by convincing proof to a reasonable certainty.

■ In asking us to sustain the finding that petitioner misappropriated $1,010.68, the State Bar stresses mainly the inadequacies of the petition for review. Even though we agree with some of the State Bar's criticisms, inadequacies in the attorney's response to disciplinary proceedings do not

necessarily remedy gaps in affirmative proof supporting the essential findings. While great weight must be given the hearing panel's apparent acceptance of Daniel's testimony concerning his receipt and deposit of a $43,008.06 check from petitioner, this court, as the ultimate trier of fact in attorney disciplinary cases, may disbelieve and reject testimony even when it is not so "inherently improbable" that its rejection by a reviewing court would be a proper basis for reversal on appeal. (See *People* v. *Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337] (reversibility on appeal).) Given the circumstances already described, including Daniel's admission that the indorsement on the Uneedus check "appears to be my signature," we perceive no convincing proof to a reasonable certainty that the check was negotiated by petitioner, rather than by Uneedus, or that petitioner made out and sent another check to Daniel for a lesser amount and misappropriated the difference.

### Check to Petitioner "as Trustee (I.R.S.)"

Daniel testified as follows: When petitioner telephoned about the settlement on December 9, 1978, Daniel said that "the IRS [Internal Revenue Service] has a lien against that" and instructed petitioner to pay the IRS lien out of the settlement proceeds and send Daniel the balance. Daniel had received a "lien notice" from the IRS for $4,696.85 dated June 13, 1978. Petitioner told Daniel he paid the IRS $5,232 in connection with the settlement in December. Daniel's first inkling that there had been no such payment came from a letter dated June 4, 1980, received from the IRS office in Springfield, Missouri, addressed to Daniel's wife, proposing a penalty assessment. That letter and its attachment, which went into evidence, stated that because "no corporate assets are available to satisfy the [tax] liability" of Uneedus, a corporation whose address was shown to be in Riverside, California, the IRS proposed to assess a "100 percent penalty" against Mrs. Daniel as the person required to account for employment or excise taxes withheld by the corporation. The dates and amounts shown on the attachment to the letter were as follows:

| Period Ended | Date Return Filed | Date Tax Assessed | Unpaid Balance of Assessment | Applicable Penalty |
|---|---|---|---|---|
| 06-30-77 | 08-13-77 | 11-07-77 | $2,999.83 | $2,013.63 |
| 09-30-77 | 11-12-77 | 03-06-78 | 1,286.89 | 897.33 |
| 12-31-77 | 02-25-78 | 03-27-78 | 381.93 | 259.84 |
| | | [Totals:] | [$ 4,668.65] | $3,170.80 |

Daniel further testified: When he received the June 1980 letter from IRS, he believed it referred to the same tax obligation he thought petitioner had

already paid. He immediately wrote IRS an indignant letter stating that his attorney, petitioner, had paid the amounts in question to IRS in Riverside in December 1978. After unsuccessfully attempting to reach petitioner by letter and telephone, he turned the matter over to his Missouri attorney, David Holden.

A series of letters from Holden to petitioner was placed in evidence. A letter of August 29, 1980, "[i]n accordance with our phone conversation today," requested "a photocopy of your cancelled check showing the payment of this tax." Follow-up letters of October 14 and 31, 1980, and January 19, 1981, indicate that petitioner still had not replied. The next communication in evidence is a mailgram from petitioner to Holden dated March 18, 1981, stating that petitioner had an appointment with IRS in Riverside the following week and asking for a "copy of present demand." Holden replied on March 19, "enclos[ing] the information from the local [Missouri] IRS office" and adding this comment: "I would like to point out that although the local demand is in the vicinity of $3300.00, that there may still be some due on the corporate account. I don't understand this exactly, other than they have apparently assessed personally Mr. and Mrs. Daniel with the 'trust portion' of the account, and they may have written off the corporate part inasmuch as apparently the corporation is now defunct."

The last letter in evidence from Holden to petitioner was dated April 9, 1981, and stated that Holden had not heard from petitioner since March 19 despite repeated phone calls, that Daniel had paid IRS the amount demanded to avoid the filing of a lien in Missouri, that Holden saw no alternative, absent a satisfactory response from petitioner, but to get in touch with the bar association in California or refer the matter to a California attorney, and that he would take some such action if he did not hear from petitioner by April 20. By check dated March 31, 1981, Daniel paid the IRS $3,329.34 (exactly 105 percent of the penalty assessment against Mrs. Daniel proposed in the letter of June 4, 1980).

Petitioner testified: When he and Daniel discussed the settlement in December 1978, "[w]e did talk about the federal lien which had been on the case at that time for probably a—I think there had been an assignment issued by Mr. Daniel to the Internal Revenue advising them. And I talked with the Internal Revenue. I believe they had filed a lien not only notifying me, but notifying the California Shopper. Because they were aware of this lawsuit pending. And that's the only place he had any money at that time coming from that he could possibly pay the liens off." In carrying out the settlement, opposing counsel put the amount owed the IRS into a separate check payable to petitioner as trustee. "And we called the Internal Revenue before

they made out the checks and asked the amount that was due and owing on this lien that had been filed, and that was the figure [used]."

The cancelled Great Western check in evidence made payable to petitioner "as trustee (I.R.S.)" was for $5,943.64. Petitioner testified that "there was a man in the office running errands, doing process serving and I asked them to make sure that that check got to the IRS in Riverside, because we had been in touch with them and told them it was on the way." He further testified: "As far as I know that check was forwarded through the Internal Revenue as planned and they never once contacted me during that period of time between 1978 and 1980 requesting or wondering where the check was or anything of that nature. I can't account for what happened." His reason for not replying to Holden's letters was that he was unable to give him a reasonable answer. He simply thought the IRS obligation had been paid.

The photocopy of the back of the check shows neither an indorsement in favor of the IRS nor any other markings indicating that IRS ever received the proceeds. Petitioner testified he could not explain their absence. The markings that do appear on the back of the check are remarkably similar to those on the back of the check for $39,037.62, made out to petitioner and his bank. Both checks are indorsed in blank by the payee or payees and both indicate that they cleared on December 15, 1978.

The hearing panel found that "[petitioner] paid no sums to IRS on behalf of William Daniel or Uneedus Corporation" and that the check for $5,943.64 "was negotiated by [petitioner]." It recommended that petitioner be ordered to repay the $5,943.64 to Daniel as a condition of probation. The review department found that the "check was negotiated by [petitioner], its proceeds commingled with his own funds and misappropriated by him."

Petitioner argues that the discrepancy between the $5,934.64 demanded by IRS at the time of the settlement, as reflected in the check for that amount, and the lesser IRS demands testified to by Daniel shows that they pertain to different tax obligations. He argues that the $5,943.64 demand may have arisen from tax liability for an earlier period and that even though the check made payable to him as trustee for IRS does not appear to have been negotiated by IRS itself, petitioner's office manager may have sent IRS a separate cashier's check for an equal amount.

Petitioner further contends that IRS must have received the $5,943.64 because it had been informed of the settlement and yet, for all that appears, failed to pursue its lien. The nature of the lien (testified to by both Daniel and petitioner) is unclear. There is no indication that either the State Bar or petitioner examined the record of the Uneedus suit to ascertain whether IRS

was granted a judgment creditor's lien (Code Civ. Proc., former § 688.1) which would have required its consent to a settlement. Nor is there any indication of any inquiry directed to counsel with whom petitioner negotiated the settlement concerning any attempt by IRS to pursue its claim against the settlement proceeds.

■ Notwithstanding those legitimate doubts, we think that the review department's finding that the proceeds of the $5,943.64 check to petitioner "as trustee (I.R.S.)" were commingled with petitioner's own funds and misappropriated by him is supported by convincing proof to a reasonable certainty. Petitioner was unable to refute the clear inference from the indorsements on the back of the check that he received its proceeds, and he produced no record that he had paid them or any amount to IRS on behalf of Uneedus or Daniel.

After Daniel's wife received the IRS billing in June 1980, both the Daniels and petitioner had every incentive to establish that IRS had in fact been paid out of the settlement proceeds. Yet neither the Daniels' repeated inquiries of the IRS office in Springfield nor petitioner's visit to the IRS office in Riverside, prompted by the series of telephone calls and letters from Daniel's attorney, produced any indication of payment.

The fact that IRS billed the Daniels for less than its claim against Uneedus corporation at the time of the settlement does not necessarily prove that the latter claim was ever satisfied. A reasonable explanation for the discrepancy appears in the passage we have quoted from the letter of March 19, 1981, written by Holden to petitioner, in which Holden states his impression, based on his dealings on behalf of Daniel with the IRS office in Springfield, that not all of the corporate tax liability of the defunct Uneedus corporation was being assessed against Mr. or Mrs. Daniel personally. That impression is corroborated by the wording of the letter of June 4, 1980, from IRS to Mrs. Daniel.

## FAILURE TO ACCOUNT

There is no finding that petitioner misappropriated any of the proceeds of the check for $39,037.62, but it was found that petitioner failed to provide his client with a proper accounting for that and other amounts received. The hearing panel and the review department found that under the retainer agreement petitioner was entitled to a fee of $35,600 (40 percent of $89,000) and that he had "incurred costs amounting to $3,437.62 including a lien against the proceeds of the settlement in the amount of $700.00 to be paid to the accountant for Uneedus Corporation; however, there is no record of the accountant having been paid."

Daniel testified that he asked an accountant to "lien the lawsuit" for a bill of $700. Daniel said that he did not "know for sure" whether the "lien" had been paid, but that the accountant had never tried to reach him and "I've never hidden my whereabouts." Petitioner testified he had no record of paying the accountant's claim but he knew it had been paid, probably by cashier's check or money order. (He recalled that the amount was $750 rather than $700.)

Daniel also testified that his only payments to petitioner, apart from the settlement proceeds, were two checks for $100 each and credit for $1,400 worth of advertising in the Uneedus newspaper, all given to defray costs of the lawsuit. The advertising was for a home exercise machine called a "bioenergizer."

Petitioner conceded that the two $100 checks were probably received in his office and credited to Daniel's account. He denied accepting credit for any advertising for the bioenergizer although he admitted he was an investor in the enterprise marketing it. He said he had never heard of any connection between bioenergizer and the present State Bar proceeding until Daniel's testimony before the hearing panel. The notice to show cause says nothing of either the two $100 checks or the advertising credit. The findings state that the checks and the advertising credit were issued as advance payments for costs, but not that they were misappropriated.

Thus, the only misappropriation of funds by petitioner that we find to be sustained by the record is his misappropriation of the proceeds of the check for $5,943.64 that he was obligated to transmit to IRS in satisfaction of his client's tax obligations. The record does establish, however, a failure by petitioner to render appropriate accounts to his client regarding other funds received. Rule 8-101 (B), of the Rules of Professional Conduct provides: "A member of the State Bar shall: (1) Promptly notify a client of the receipt of his funds, securities, or other properties. . . . (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the member of the State Bar and render appropriate accounts to his client regarding them. . . ."

With respect to the settlement of the action by Uneedus Corporation against California Shopper for $89,000, the hearing panel and the review department found that petitioner "did not notify Uneedus Corporation or Mr. Daniel of the settlement either as to fact or amount." They further found that petitioner "did not present to Uneedus Corporation or to William Daniel an accounting of the receipt and distribution of funds received by virtue of the settlement . . . ."

Though there is no evidence that petitioner failed to notify his client promptly of the "fact" of the settlement, Daniel's testimony does indicate a failure to give him an accurate report of the "amount." Daniel testified: Petitioner phoned him on December 9, 1978, said that "the appeals court awarded us a judgment," and "asked me how I'd like to have a check for $49,000." Daniel understood from that conversation that the "total amount of the settlement or judgment" was $85,000, comprised of $75,000 plus $10,000 for attorney's fees. "But according to our contract the attorney's fees would be included in the total of the deal." Daniel first learned that the amount of the settlement was $89,000 in a newspaper story concerning a suit by California Shopper against an insurance company for not defending it against the Uneedus action.

Daniel further testified: On learning of the settlement, he instructed petitioner to pay the IRS lien and send him the balance. After receiving a check from petitioner for $43,008.06, he asked petitioner what the difference was between the amount he had received and the $49,000 check petitioner had promised. Petitioner replied that "he had paid the IRS, and the rest of it was cost of the suit." Daniel asked petitioner for documentation, but petitioner provided none.

The State Bar's brief in this court explains that the Court of Appeal in *Uneedus Corp.* v. *California Shopper* "found in favor of Uneedus in the amount of $85,000. In lieu of further appeal, California Shopper offered an immediate cash settlement." Petitioner testified: The sum of $89,000 "was just rounded off as a matter of settlement rather than actually going through and figuring all the cost I had on appeal and that sort of thing. I had figured my cost at that time at about 34, $3,500. I don't recall exactly what the figure was. It must have been close to 4,000, because that's what we came up with. That's what they agreed to pay." He told Daniel that Daniel's share would be $49,000 after petitioner's fee and costs. (The sum of the $44,018.74 settlement check to Uneedus plus the $5,943.64 for payment of Uneedus' obligation to IRS was in fact $49,962.38.) Petitioner did record his costs incurred for Uneedus on a "client sheet," but he never provided Daniel with any statement of those costs since Daniel had said he was willing to accept the $49,000. The client sheet was placed in the case file when the case was closed. During the year following the settlement, petitioner had a complete turnover of office help. Petitioner's "then secretary took off and she had been keeping the books and she took all of the bank books and so forth that had been kept at that time." Petitioner has been unable to locate the Uneedus-Daniel file despite the inquiries from Daniel and his attorney, Holden, in 1980, and despite a subpena for his records issued in California Shopper's suit against its insurer.

The finding that petitioner failed to give his client an accounting of the receipt and disposition of the settlement proceeds is sustained by convincing proof to a reasonable certainty. ■ An attorney's failure to provide a proper accounting to the client for funds received on the client's behalf is ground for discipline regardless of whether there is consequent financial loss by the client. (*Fitzsimmons* v. *State Bar* (1983) 34 Cal.3d 327, 331-332 [193 Cal.Rptr. 896, 667 P.2d 700].)

PRIOR DISCIPLINE

Toward the end of the hearing before the panel, one of the three referees asked petitioner if he had been involved in prior disciplinary proceedings. The State Bar examiner objected to the question as improper until after a determination of culpability. The referee asked if the parties were "willing to come back at another date." Petitioner said he would "waive the right" and testified he had been disciplined previously for "commingling." The examiner then recited notations in the "membership record" of disciplinary actions against petitioner in 1964, 1968, and 1969; the record disclosed that in each proceeding, probation for a two- or three-year period was imposed and, in one case, petitioner was actually suspended for thirty days. The examiner furnished no further details, and petitioner said that all of the prior proceedings against him involved commingling.

The review department had before it the records of the pleadings, findings, and dispositions in those three matters as well as in a 1976 proceeding in which petitioner received a private reproval. The review department's minutes stated that it was recommending disbarment rather than the lesser discipline recommended by the hearing panel because the panel did not appear to have given sufficient consideration to petitioner's prior disciplinary record.

In the first prior proceeding the findings show: After trial of a medical malpractice claim, petitioner recovered $80,000 on behalf of a widow and her two minor children. That amount was deposited in petitioner's trust account on June 11, 1962. On and before June 15, he (1) collected from the widow, for jury and medical witness fees, $950 more than the correct amounts and (2) paid the widow $31,545.60 as the amount due her, setting aside $17,000 for the children, whereas the amount for the children should have been $18,000. The foregoing derelictions were due to misunderstandings and improper office procedures rather than to wrongful intent. After June 28, 1962, however, petitioner's trust account contained insufficient funds to meet his obligations as trustee for the children. An $85 check on the account for the premiums on bonds for the widow as guardian for the children, drawn in January 1963, was refused payment for insufficient funds

in February 1963. Even more seriously, checks for $6,798.12 and $8,437.50, presented to the widow as guardian of the children in January and February 1963, were refused payment for insufficient funds. Petitioner replaced the latter two trust-account checks with cashier's checks in May and June 1963. The wrongful diversions from the trust account and the writing of checks with insufficient funds were knowing and willful.

In reviewing and adopting those findings in June 1964, the State Bar Board of Governors further found that petitioner had "reorganized his office procedures," putting them under the supervision of his brother, an attorney, and had "informed the Board that the conditions which led to the misuse of trust funds and other wrongful acts hereinabove found have been corrected." In October 1964, this court adopted the board's recommendation that petitioner be put on probation for two years.

In the second prior proceeding it was found as follows: Petitioner represented a worker, injured in the course of employment, in a personal injury suit against a party other than the employer and, in December 1960, obtained a settlement, after trial, of $70,000. The State Compensation Insurance Fund (SCIF) indorsed the settlement draft on petitioner's promise to hold its share, $11,855.73, less one third attorney's fee, in trust. Petitioner deposited the draft in a bank account that was not a trust account and thereby commingled it with his own funds. In February 1962 petitioner failed to honor SCIF's demand for payment of its share, and in September 1964, SCIF procured judgment against petitioner for $7,789.83 plus interest and costs. Charges that petitioner had also wrongfully withheld or converted funds of the employee-client were expressly found not true. The disciplinary board recommended two years probation with one month of actual suspension, stating that it had taken into account the prior disciplinary proceeding. This court adopted the recommendation in June 1968.

In the third prior proceeding it was found that in May 1963 petitioner received, and deposited in his personal checking account rather than in a trust account, drafts in satisfaction of judgments for almost $50,000 in damages for personal injuries and property damage incurred by his client. It was further found that petitioner "wrongfully appropriated a substantial portion of said funds to his own use and benefit" but that petitioner had made full restitution. The hearings before the local administrative committee were held in 1967, but the committee did not issue findings until May 1969. The disciplinary board expressly took into account the prior two disciplinary proceedings against petitioner. Its recommendation of three years probation, with no actual suspension, was adopted by this court in December 1969.

In the fourth prior proceeding it was found as follows: In March or April 1973 petitioner undertook to investigate and analyze a client's potential medical malpractice claim. He failed to do so in timely fashion and failed to communicate with the client, who complained to the State Bar in August 1974. Only a private reproval was administered despite the prior three disciplinary proceedings.

DISCIPLINE

There is a marked disparity between the hearing panel's recommendation that petitioner be placed on probation for three years with six months actual suspension and the recommendation of the review department that he be disbarred. ■ We generally give the reviewing board's recommendation of discipline the greater weight. (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 578 [119 Cal.Rptr. 335, 531 P.2d 1119].) The ultimate determination, of course, is ours. (*Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106].) ■ "Absent mitigating circumstances, commingling and misappropriation generally call for disbarment or actual suspension; this is especially true where there is a prior record of discipline. [Citations.]" (*Palomo* v. *State Bar* (1984) 36 Cal.3d 785, 797 [205 Cal.Rptr. 834, 685 P.2d 1185].)

Petitioner contends that his offenses are mitigated by such factors as his reputation within the legal community, service as a temporary superior court judge at least 10 days a year since 1975, and a county bar association award for pro bono legal services to persons of limited means. He acknowledges that he failed to present evidence of any such mitigation before the hearing panel, claiming, by way of excuse, that (1) he did not want to disclose to his potential clients that he was being charged with misconduct before he was actually found guilty and (2) the panel indicated a desire to determine the penalty immediately, and he did not want to antagonize them by asking that the matter be put over until he could produce character witnesses. The record reflects no such impatience on the part of the panel. In any event, petitioner was entitled to serve and file, within 10 days after service of the panel's decision, an application for a hearing de novo or for permission to present additional evidence. (Rules Proc. of State Bar, rule 562.) ■ He now complains that the review department refused to receive such mitigating evidence. It was not required to do so. (*Warner* v. *State Bar* (1983) 34 Cal.3d 36, 42 [192 Cal.Rptr. 244, 664 P.2d 148]; *Coviello* v. *State Bar* (1955) 45 Cal.2d 57, 65 [286 P.2d 357].)

In this court petitioner does not seek to escape all punishment. He concedes that even if he were exonerated of the charges of misappropriation, he should be required to make restitution of any amounts awarded Daniel

from the Client Security Fund (Bus. & Prof. Code, § 6140.5; Rules Proc. of State Bar, rules 670-688) because of petitioner's negligence in not maintaining proper records. (We are advised by respondent that in a final order, not reviewable in this proceeding (Rules Proc. of State Bar, rule 681 A), the Review Department of the State Bar awarded Daniel $6,954.32 from the fund.) In the alternative, petitioner seeks a hearing de novo on all charges, or as to discipline only.

Although the review department's recommendation of disbarment was made by a vote of eight to two, three referee-members voted for a hearing de novo before a hearing panel, including one who stated his vote for disbarment was "in light of the findings adopted by the Review Department and [petitioner's] prior record of discipline."

█ The extent of discipline does not derive from a fixed formula but rather is determined from a balanced consideration of the relevant factors. (*Greenbaum* v. *State Bar* (1976) 15 Cal.3d 893, 904 [126 Cal.Rptr. 785, 544 P.2d 921]; *Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 919 [101 Cal.Rptr. 369, 495 P.2d 1289].) The review department's recommendation of disbarment was based in part on findings that we have concluded were not sustained by the evidence, i.e., that petitioner negotiated the check for $44,018.74 made payable to Uneedus Corporation without authority from Daniel, that he gave Daniel his own check for $43,008.06, and that he failed to account for, and misappropriated, the difference. By adopting those findings, the review department must have concluded that petitioner testified falsely in describing his dispatch of the Uneedus check to Daniel, and probably deemed this lack of candor in his testimony to be an aggravating circumstance in the determination of discipline. (See *Honoroff* v. *State Bar* (1958) 50 Cal.2d 202, 210 [323 P.2d 1003]; *Burns* v. *State Bar* (1955) 45 Cal.2d 296, 303 [288 P.2d 514].)

There remains, of course, the very serious misappropriation of the proceeds of the $5,943.64 check intended for the IRS. Yet apart from petitioner's testimony that he had instructed his office staff to transmit the check to IRS and that that was done as far as he knew, there appears no effort on his part to fabricate or conceal evidence on the issue. He freely admitted that he could not explain the absence of any indorsement to or by IRS and did not attempt to show that he had paid IRS by some other means.

Moreover, petitioner admitted that he failed to provide Daniel with an accounting of disbursements and that he could find no records, apart from the cancelled checks in evidence, of his receipts or disbursements on behalf of Uneedus and Daniel. His petition for review concedes that because of his negligence in failing to keep proper records, we should order him to reim-

burse the client security fund for its payment to Daniel even if we reject the charges of misappropriation. ■ The candor, cooperation and remorse which petitioner for the most part has displayed throughout the present disciplinary proceedings are mitigating factors in our determination of discipline. (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].)

■ We turn to petitioner's prior disciplinary record, stressed by the review department as a principal basis for its recommendation of disbarment. The first three proceedings (and the only ones resulting in discipline greater than private reproval) were based on overlapping periods of commingling and/or misappropriation in the 1960's. In the first proceeding, commenced in July 1963, petitioner was found to have wrongfully diverted funds from his trust account beginning in June 1962. In the second proceeding, commenced in July 1966, petitioner was found to have deposited settlement proceeds in a nontrust bank account in December 1960 and to have refused a client's demand for its share of the settlement in February 1962; the client procured judgment against him in September 1964. In the third proceeding, commenced in July 1967, petitioner was found to have deposited settlement proceeds in his personal checking account in May 1963 and to have misappropriated a substantial portion thereof. Restitution had been made by the time findings were rendered in May 1969. Thus, much of the misconduct involved in the three proceedings appears to have occurred before July 1963, when the first proceeding was commenced, and even more of it appears to have taken place before June 1964, when the State Bar found (in the first proceeding) that petitioner seemed to have corrected the office procedures that had led to his "misuse of trust funds and other unlawful acts." This time sequence, together with the relatively light discipline imposed (two- and three-year periods of probation with only one month of actual suspension) somewhat lessens the aggravating weight to be given those prior proceedings in determining discipline now.

Under all the circumstances, we conclude that the State Bar's recommendation of disbarment should not be followed, and that we should impose lesser discipline that is nonetheless more severe than the hearing panel's recommendation of three years probation with six months actual suspension. Accordingly, we order that petitioner be suspended from the practice of law for five years; that execution of suspension be stayed and petitioner be placed on probation for five years with actual suspension for one year or until such later time as petitioner (1) has made restitution in the sum of $6,954.32 and furnished satisfactory proof thereof to the State Bar and (2) has taken and passed the Professional Responsibility Examination given by the State Bar Committee of Bar Examiners. The conditions of probation are that petitioner make such periodic reports as the State Bar may reasonably

require for the purpose of assuring that all clients' funds that he has received or has in his possession have been deposited in a proper trust account and continuously maintained in such account until properly withdrawn on the client's behalf and, further, that petitioner comply with all provisions of the State Bar Act and the Rules of Professional Conduct. We also order that petitioner comply with rule 955 of the California Rules of Court, and that the acts specified in subdivisions (a) and (c) of that rule be performed within 30 and 40 days, respectively, after this decision becomes final.

**LUCAS, J.**—I dissent. I disagree with my colleagues that the review department has proven by convincing evidence to a reasonable certainty that petitioner misappropriated the $5,943 check that was supposed to be paid to the Internal Revenue Service (IRS). Neither petitioner nor the State Bar has submitted any documentation from the IRS proving the lien at issue was not paid off. No proof was even made that the penalty assessed by the IRS on Mrs. Daniel was for nonpayment of the lien at issue. Under these circumstances, I believe the State Bar should have the burden of producing documentation proving petitioner did not pay the IRS lien.

There is no question that petitioner was not as careful as he should have been in handling the funds and that he failed to give Daniel or Uneedus a full accounting. But, on this record, I am not convinced to a reasonable certainty that petitioner is to blame for the penalty assessed by the IRS on Mrs. Daniel, and thus I am uncertain that petitioner deserves the discipline proposed by the majority. I would remand for a de novo hearing before the State Bar.